Robert M. LAYNE, Plaintiff, Appellee,

v.

Douglas VINZANT, Frank Hall and Charles Gaughan, Defendants, Appellants.

Robert M. LAYNE, Plaintiff, Appellant,

v.

Douglas VINZANT et al., Defendants, Appellees.

Nos. 80–1152, 80–1244.

United States Court of Appeals, First Circuit.

Argued Oct. 9, 1980.

Decided July 31, 1981.

Rehearing and Rehearing En Banc Denied Sept. 23, 1981.

Jonathan Shapiro, Boston, Mass., with whom Anne B. Goldstein and Stern & Shapiro, Boston, Mass., were on brief, for Robert M. Layne.

James Remeika, Counsel, Dept. of Correction, Boston, Mass., with whom Michael C. Donahue, Sp. Asst. Atty. Gen., Boston, Mass., was on brief, for Douglas Vinzant.

Roberta Thomas Brown, Asst. Atty. Gen., Boston, Mass., with whom Francis X. Bellotti, Atty. Gen., and Stephen R. Delinsky, Asst. Atty. Gen., Chief, Criminal Bureau, Boston, Mass., were on brief, for Frank Hall and Charles Gaughan.

Before COFFIN, Chief Judge, ALDRICH and PELL *, Circuit Judges.

ALDRICH, Senior Circuit Judge.

These are cross appeals following a jury trial of a Civil Rights action, 42 U.S.C. § 1983. Plaintiff, Robert M. Layne, is a Massachusetts prisoner serving a sentence for kidnapping and for the shooting of two state policemen for which he will not be eligible for parole for some time. The now remaining defendants [1] are Charles W. Gaughan, Superintendent MCI—(Massachusetts Correctional Institution) Bridgewater, at all material times; Frank Hall, Commissioner of Corrections, October 1, 1973 to the date of trial; Douglas Vinzant, Superintendent MCI-Walpole, September 5, 1973 through 1974, and Walter Moquin, at all material times Supervising Correctional Officer at Bridgewater under Gaughan. In answers to special questions the jury found compensatory damages in the amount of $75,000 against Gaughan, Hall and Vinzant, jointly, for "deliberate indifference to a serious medical need," adding, as punitive damages Gaughan, $7,500, Hall, $7,500, and Vinzant, $15,000. In addition, the jury found against Vinzant for transferring plaintiff from Walpole to Bridgewater in order to violate plaintiff's right of access to the

---

* Of the Seventh Circuit, sitting by designation.

1. The jury found in favor of six other correction officials, including Dr. Pastorello, Resident Physician at Walpole. Plaintiff has not appealed therefrom.

courts, awarding $10,000 compensatory and $2,000 punitive damages, and against Moquin, for keeping plaintiff's legal materials from him for the same purpose, $5,000 compensatory and $1,000 punitive. The jury found in favor of Moquin on the deliberate indifference claim, in favor of Hall on the improper transfer claim, and in favor of Gaughan on the denial-of-papers claim. The court set aside all punitive damages and entered judgment n. o. v. for defendants on the access claims. It refused to enter judgment n. o. v. or to grant a new trial on the remaining $75,000 finding. Plaintiff and the three defendants appeal.

■ Defendants' basic complaint is that the evidence did not warrant findings against them. In part they point to the fact that much of their conduct—or nonconduct—occurred before the leading Supreme Court case of *Estelle v. Gamble*, 1976, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251, quoted by the court in the charge. We find this irrelevant. a) There were a number of similar lower court cases decided prior to *Estelle*, as the Court there noted, 429 U.S. at 106 n.14, 97 S.Ct. at 292 n.14. b) To the extent that *Estelle*, or any of these cases, represented new law, it was that the courts would enforce liability for such behavior, not that, until then, conduct there held actionable was moral or proper or acceptable. It should not require a Supreme Court decision to point out that a superintendent of a prison does not have the choice of whether to be a good samaritan or to pass by, Luke 10:33, at least what he sees. Rather, we hold that while defendants are not "charged with predicting the future course of consti-

tutional law," *Pierson v. Ray*, 1967, 386 U.S. 547, 557, 87 S.Ct. 1213, 1219, 18 L.Ed.2d 288, they are expected to conform to "the evolving standards of decency that mark the progress of a maturing society." *Estelle*, ante, 429 U.S. at 102, 97 S.Ct. at 290.

■ On the other hand, a case involving nonconduct may, and this one does, present far more difficult questions than the case of an easily recognizable, affirmative act. *E.g., Furtado v. Bishop*, 1 Cir., 1979, 604 F.2d 80, *cert. denied*, 444 U.S. 1035, 100 S.Ct. 710, 62 L.Ed.2d 672 (physical beatings). The difficulties are compounded when it is supervisory officials, rather than those with direct, day-to-day contact with the prisoner, who are sought to be charged, and particularly so when the latter are acquitted. Because "an inadvertent failure to provide medical care" is not actionable, even if negligent, *Estelle*, ante, 429 U.S. at 105–06, 97 S.Ct. at 291–92, and because there is no *respondeat superior* liability under section 1983, *Kostka v. Hogg*, 1 Cir., 1977, 560 F.2d 37, 40, *see Sims v. Adams*, 5 Cir., 1976, 537 F.2d 829, 831–32, the ultimate question [2] is the state of mind of the defendant. When a supervisory official is placed on actual notice [3] of a prisoner's need for physical protection or medical care, "administrative negligence can rise to the level of deliberate indifference to or reckless disregard for that prisoner's safety." *West v. Rowe*, N.D.Ill., 1978, 448 F.Supp. 58, 60; *see Corby v. Conboy*, 2 Cir., 1972, 457 F.2d 251, 254; *Martinez v. Mancusi*, 2 Cir., 1970, 443 F.2d 921, 924, *cert. denied*, 401 U.S. 983, 91 S.Ct. 1202, 28 L.Ed.2d 335. The question is,

---

**2.** Assuming, of course, the threshold showing of inadequate medical care.

**3.** We pause to note the distinction between this case and *DiMarzo v. Cahill*, 1 Cir., 1978, 575 F.2d 15, 17–18, *cert. denied*, 439 U.S. 927, 99 S.Ct. 312, 58 L.Ed.2d 320, in which we charged the Commissioner of Corrections with the constructive knowledge of prison-wide conditions which he was statutorily obliged to inspect and remedy. *See also Inmates of Suffolk County Jail v. Eisenstadt*, 1 Cir., 1974, 494 F.2d 1196, 1199, *cert. denied*, 419 U.S. 977, 95 S.Ct. 239, 42 L.Ed.2d 189. We were careful to note in *DiMarzo* that we were "not confronted with sporadic incidents, over which the Commis-

sioner might properly claim to have no knowledge or control." 575 F.2d at 17; *see Hawkins v. Hall*, 1 Cir., 1981, 644 F.2d 914, 918 n.4. Similarly, we do not see how the Commissioner, or the superintendent of a prison as large as those involved here, can be held responsible for the individualized complaints of every prisoner in his charge, except on the basis of actual notice of facts at least sufficient to put him on inquiry. *See Hampton v. Holmesburg Prison Officials*, 3 Cir., 1976, 546 F.2d 1077, 1082. If *Clappier v. Flynn*, 10 Cir., 1979, 605 F.2d 519, 531–34 holds the contrary, we decline to follow it.

charging them with reasonable inquiry, and allowing for reliance on the opinions of the treating doctors, see *McCracken v. Jones*, 10 Cir., 1977, 562 F.2d 22, 24, *cert. denied*, 435 U.S. 917, 98 S.Ct. 1474, 55 L.Ed.2d 509, how did the overall picture appear? What appeared to lack doing? What could be done?

■ Before turning to the evidence we note two guiding principles governing our review. The first is that while, on a defendant's motion, it is axiomatic that the evidence is to be viewed in the light most favorable to the plaintiff, the "field of vision" encompasses, to a degree, uncontradicted evidence introduced by the defense. *Grayson v. Pride Golf Tee Co.*, 1 Cir., 1970, 433 F.2d 572, 576; *Dehydrating Process Co. v. A. O. Smith Corp.*, 1 Cir., 1961, 292 F.2d 653, 656 and n.6, *cert. denied*, 368 U.S. 931, 82 S.Ct. 368, 7 L.Ed.2d 194. This principle is particularly applicable to documentary evidence, the existence of which—although in some cases its truthfulness—is not affirmatively denied by plaintiff. Such documents, where prepared by others and part of the institutional records, are part of the picture before supervisory defendants as bearing on their knowledge and state of mind.

■ The second principle relates to the fact that none of the present defendants, except Moquin, testified. Plaintiff seeks to invoke the rule that if a party who is shown to have knowledge of a fact fails to testify, there is an inference that his testimony would not be favorable to him. *Cf. Commercial Ins. Co. v. Gonzales*, 1 Cir., 1975, 512 F.2d 1307, 1314–15, *cert. denied*, 423 U.S. 838, 96 S.Ct. 65, 46 L.Ed.2d 57 (unproduced document). Such an inference, however, cannot, of itself, be used to satisfy the opponent's burden of proof.

"[T]he failure of a party to testify and the permissible inference to be drawn therefrom will not convert evidence otherwise insufficient into a prima facie case." *Transcontinental Gas Pipe Line Corp. v. Mobile Drilling Barge MR. CHARLIE*, 5 Cir., 1970, 424 F.2d 684, 694,

*cert. denied*, 400 U.S. 832, 91 S.Ct. 65, 27 L.Ed.2d 64.

"The inference cannot take the place of evidence; it cannot supply a deficiency in the other party's case nor can it be regarded as proof of any essential fact. As has been said, the effect of the failure to call the witness is 'persuasive rather than probative.'" (Citations omitted). *Laffin v. Ryan*, 1957, 4 App.Div.2d 21, 162 N.Y. S.2d 730, 736.

Contentions in plaintiff's brief that "the jury could infer, in the absence of evidence to the contrary, that defendant Gaughan . . . ." are unsound. If there was an independent basis for an inference with respect to Gaughan, the jury could draw it, and could do so whether there was evidence to the contrary or not. Plaintiff, however, seeks to create the inferences solely from the fact that defendants did not testify. This cannot be done.

Turning to the evidence, plaintiff escaped from a Connecticut mental institution, where he was being held for observation pending trial on federal charges. Later he was stopped for questioning by two Massachusetts state troopers, whom he shot. On September 14, 1971 he was apprehended.[4] He spent the night in the state police barracks, and was arraigned in the Worcester Superior Court the following day and taken to MCI Bridgewater for medical and psychiatric observation. While at the barracks, and again in the cruiser on the way to Bridgewater, he was severely beaten, including blows to the head, by unidentified state troopers. His course thereafter was as follows.

| | |
|---|---|
| Sept. 16-20, 1971 | Massachusetts General Hospital |
| Sept. 20 - Dec. 1, 1971 | MCI Bridgewater |
| Dec. 1 - Jan. 11, 1972 | Worcester County Jail |
| Jan. 11 - June 6, 1972 | Bridgewater |
| June 6 - June 19, 1972 | Worcester Superior Court for trial and sentence |
| June 19 - June 28, 1972 | MCI Walpole |
| June 28 - July 10, 1972 | MCI Norfolk |
| July 10 - Dec. 21, 1972 | Walpole |
| Dec. 21, 1972 | New England Medical Center |

---

**4.** At some point between his escape in Connecticut and his apprehension, Layne apparently kidnapped a woman, for which he was later convicted.

| | |
|---|---|
| Dec. 22, '72 - Feb. 13, 1973 | Walpole |
| Feb. 13 - Feb. 28, 1973 | Lakeville Sanitarium |
| Feb. 28 - March 6, 1973 | Norfolk |
| March 6 - Sept. 13, 1973 | Walpole |
| (Aug. 29, 1973 - *suit* brought) | |
| Sept. 13 - April 4, 1974 | Bridgewater |
| (Mar. 7, 1974, supplemental complaint) | |
| April 5, 1974 - to date | Walpole |

*Charles W. Gaughan (Bridgewater)* (September 1971—June 1972)[5]

The original complaint, written pro se, and in considerable detail, charged Gaughan with wrongfully removing plaintiff from the Massachusetts General Hospital, and the supplemental complaint charged him, and others, with depriving plaintiff of his papers to interfere with the prosecution of this suit, as to which latter the jury acquitted him. Neither charged him with improper medical treatment in any other respect, but plaintiff did so, successfully, at the trial, and as the pleadings could have been amended, F.R.Civ.P. 15(b), we will consider it to have been done.

Upon his arrival at Bridgewater plaintiff had been diagnosed as having, *inter alia*, a brain concussion and possible brain contusion—a "bruise on the brain." Due to deterioration in his condition he was transferred the day after his arrival to Massachusetts General Hospital. His Discharge Summary four days later diagnosed a "cerebral contusion of right hemisphere with probable hemiparesis of the left arm and left leg with anesthesia of his left arm." Recommendations included "[t]o further evaluate the etiology of his decreased function of his left arm" and "[f]ull psychiatric examination."

The report noted that while a patient in his condition would not ordinarily be discharged so soon, this was done on the "understanding that Bridgewater has competent medical facilities, and . . . this patient poses a serious danger to himself and surrounding personnel," and that Bridgewater was "very grateful to have the patient in greater security than they felt we could afford here."

In his original complaint, and extensively in his brief on appeal, plaintiff charges that the discharge was "against medical advice." Gaughan counters that it was the Bridgewater doctors, and not he, who were responsible for the discharge. We find both contentions unwarranted.

 There is a permissible inference that Gaughan was responsible for plaintiff's discharge. At the same time, not only do we not read the hospital record as advising against it,[6] we do not see how a jury could reasonably find the transfer, per se, to be "repugnant to the conscience of mankind." While it may well be true that Mass. General, and private hospitals generally, have better facilities than state prison hospitals, against this must be balanced the security risk, real and reasonably supposed,[7] posed by a prisoner with plaintiff's then recent history. The right to be free from cruel and unusual punishment does not include the right to the treatment of one's choice. *See Ferranti v. Moran,* 1 Cir., 1980, 618 F.2d 888, 890–91. We reject as unwarranted any liability based on the transfer itself, and turn to whether Gaughan was guilty of actionable neglect thereafter.

---

5. Plaintiff's stay at Bridgewater had one interruption. The initial commitment had been for physical and psychiatric evaluation. After this had been accomplished in December (the latter diagnosis being "Sociopathic Personality Disorder Decompensating into Schizophrenic Paranoid Type," he was returned to the Worcester County jail to await trial. However, after a few weeks he was returned to Bridgewater. No complaint is made against any defendant for this Worcester episode.

6. On the contrary, the doctors acceded, on the expressed assumption that the facilities at Bridgewater would permit carrying out their specific recommendations. In fact they were all attended to, except determining etiology, as to which see n.8, post.

7. We do not accept plaintiff's argument that, since he was bedridden, he could not reasonably have been thought to pose a threat. Stranger things have happened, and the MGH discharge summary recited that "this patient poses a serious danger to himself and surrounding personnel."

 Layne's chief complaint regarding the conditions at Bridgewater is that he did not receive physiotherapy to combat the hemiparesis (specifically, paralysis of the left arm and semiparalysis of the left leg) which has kept him basically in a wheelchair ever since his original incarceration.[8] He testified that his treatment was "kind of haphazard." In his brief this becomes "no rehabilitative therapy whatever for the entire nine months of his incarceration" at Bridgewater. Alongside these general characterizations must be placed the specific evidence. Layne testified that a nurse or fellow prisoner would help him try to walk, once or twice a week. We quote from the notes in his folder. Doctor's note (9/20/71) "[F]eels tired & complaining of severe headache ... Bed rest." (9/22/71) "Encourage mod. active exercise ... Sit up $\bar{c}$ assistance." (9/30/71) "Pt. appears stuporous, however he is responsive ...." Nurse's note (10/5/71) "Up in chair for long period." Doctor's note (11/18/71) "Pt. appears to be about the same—attempts to ambulate $\bar{c}$ use of walker not very successful." (1/12/72) "Encourage active and passive exercises and ambulation with walker." (1/19/72) "Doing exercises active and passive with assistance and walker." (2/9/72) "Pt. generally well and has been encouraged to walk with assistance." Nurse's note (3/22/72) "Getting therapy for arm and leg." There came a change. Doctor's note (3/28/72) "Pt. refusing physical therapy. He has made some progress, however, but is now uncooperative and refuses to help himself." Nurse's note (6/3/72) "Refuses therapy for leg. Hates rules and regulations. Hates to go upstairs in smoke room—would rather be locked up."

Whether or not a jury would be warranted in finding this course of treatment substandard, even to the point of malpractice,

is not the issue; as already noted, the only permissible basis for liability is deliberate indifference on the part of the defendant. *Estelle v. Gamble,* ante, 429 U.S. at 105–06, 97 S.Ct. at 291–92. Thus, "[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake v. Lucas,* 6 Cir., 1976, 537 F.2d 857, 860 n.5; *see Ferranti v. Moran,* ante, 618 F.2d at 890–91. We do not say that treatment received may never be "so clearly inadequate as to amount to a refusal to provide essential care." *Thomas v. Pate,* 7 Cir., 1974, 493 F.2d 151, 158, *cert. denied,* 419 U.S. 879, 95 S.Ct. 143, 42 L.Ed.2d 119. A study of the record, however, makes clear that the evidence did not warrant such a finding here. Unlike Dr. Pastorello's 1974 letter to Superintendent Vinzant at Walpole, post, there is nothing in the medical records to alert Gaughan that plaintiff's treatment was inadequate. Rather, it appeared that he was not cooperating with what he got.

*The Absolved Defendants* (July 1972—September 1973)

Following his conviction plaintiff was sent briefly to Walpole, and thence to the hospital at MCI-Norfolk. During his stay there, of which he does not complain, he was examined and a program of rehabilitative therapy was prescribed. However, on July 10, 1972, he requested to be discharged, against the advice of the Medical Director, Dr. Della Penna. He admitted completing the request form, but testified this was because "Dr. Della Penna was talking about sending me to Bridgewater and I didn't care to go to Bridgewater." He was returned to Walpole that day.[9]

---

**8.** Plaintiff also complains of the fact that doctors at Bridgewater did not succeed in determining the etiology of his hemiparesis, but neither did doctors elsewhere for some time. Evaluation of his condition was later described as "very difficult"; even electrodiagnostic testing left an "unclear picture." Plaintiff has not shown otherwise; much less has he demon-

strated that the alleged failures were attributable to defendant Gaughan's deliberate neglect.

**9.** Dr. Della Penna was named as a defendant, but was not served, and did not testify. If, in fact, he made such a threat, it is not of record. The sole record is plaintiff's signed request, admitting it was against advice.

■ Plaintiff's complaint recites, and at considerable length, for reasons that do not appear, his brief movingly argues continuous inadequate treatment at Walpole from July, 1972 to the date of his transfer back to Bridgewater in September, 1973.[10] During this period plaintiff was sent for extensive physiotherapy and training to Lakeville Sanitarium, but was, allegedly, callously removed after two weeks, before he had received the full benefits. Such benefits as he did receive allegedly were lost by subsequent lack of attention at Walpole.[11] This and various other Walpole claims were asserted in his original complaint, dated August 29, 1973 which, with the exception of the act of removal from Massachusetts General Hospital to Bridgewater, was devoted entirely thereto. However, none of the original Walpole defendants are still in the case, having been either dismissed by consent or absolved by the jury. Plaintiff explains the latter result as demonstrating a "sophisticated understanding" of who was really responsible for his mistreatment. This is a marked change from his testimony at trial. In all events, this jury decision makes presently irrelevant plaintiff's complaints of his mistreatment at Walpole during this period, or, rather, constitutes a jury finding that they were unjustified.

*Douglas Vinzant (Walpole) (September 13, 1973)*

On September 13, 1973 plaintiff was transferred from Walpole back to Bridgewater, an action which the supplemental complaint charges was improperly due to this suit. He had given the complaint to prison authorities for mailing on August 29 or 31, but it did not reach the district court until September 12. On September 5, Douglas Vinzant replaced defendant John Moriarty as superintendent at Walpole. On September 10, plaintiff wrote the court inquiring as to the lack of acknowledgement of his complaint, and on September 13, on according to him ten minutes notice, he was taken to Bridgewater. Although plaintiff charged several defendants with an improper transfer, the jury found only Vinzant liable. The court set this finding aside, and ordered judgment for the defendant.

■ The items in this picture are diverse. On the one side it may be said that the correspondence in dates between the institution of suit and the transfer raises an inference of retaliation. *Cf. Ferranti v. Moran,* ante, 618 F.2d at 892; *McDonald v. Hall,* 1 Cir., 1979, 610 F.2d 16, 18. Circumstantial force may be thought added by the disappearance of plaintiff's legal materials, for which, however, he sued Bridgewater, but not Vinzant or other Walpole defendants. *Cf. Ferranti,* ante, 618 F.2d at 892; *Russell v. Oliver,* 4 Cir., 1977, 552 F.2d 115, 116. On the other hand, as we observed in *McDonald* while rejecting a motion to dismiss,

"[O]n remand, the appellant will face a substantial burden in attempting to prove that the actual motivating factor for his transfer was as he alleges. Plaintiff must prove that he would not have been transferred 'but for' the alleged reason. Moreover, the requirement of a 'but for' showing together with the wide latitude afforded prison officials in ordering transfers may make summary judgment particularly appropriate." 610 F.2d at 18–19 (Citations omitted.)

The case against plaintiff's inferences was substantial. In the first place, Dr. Pastorello testified that the person responsible was himself.[12] This was not testimony made up for the trial to relieve Vinzant (assuming Pastorello, a named defendant, would have cared to do so), but was corroborated by one of plaintiff's exhibits, a letter

10. *E.g.,* "[N]o treatment whatsoever until December, 1972."

11. "The premature return of Layne to Walpole completely undermined the effects of the therapy."

12. Q. "Are you saying it was your decision to request the transfer in the first place?"
A. "Yes, it was my decision to send him."

Pastorello wrote Vinzant on April 24, 1974, reprinted in full, post.[13]

Second, against plaintiff's testimony that the transfer was sudden and without warning, alleged in his complaint as preventing him from getting his legal materials together, is the statement in his letter three days earlier, "I have ... been locked up in my cell here in the hospital today, and notified that I may be very shortly sent to Bridgewater."

Third, there was ample evidence that the transfer was for the reason stated in the Transfer Summary—"Medical Treatment." Pastorello testified that he requested it so that plaintiff would receive treatment for a drug addiction. This was a valid reason on its face, and were an inquisitive Superintendent to seek corroboration, he could find it in plaintiff's then recent (June, 1973) disciplinary conviction for possession of syringe parts. Plaintiff, moreover, admitted at trial that he had had a drug problem, though he claimed it had been cleared up. At Bridgewater he was placed in the Addiction Center Hospital. His testimony that he did not there receive any treatment for his addiction, if conceivably true, gave no basis for attributing this to the Walpole defendants. In short, on this record any possible inference to be derived from the circumstances of the transfer were fully met by the evidence of a medical reason. The mere chronology alleged in the complaint, while sufficient to withstand a motion to dismiss, cannot get plaintiff to the jury once defendants have produced evidence of a legitimate reason. A contrary rule would take away the "wide latitude afforded prison officials in ordering transfers," McDonald, ante, 610 F.2d at 18–19; see Meachum v. Fano, 1976, 427 U.S. 215, 226–29, 96 S.Ct. 2532, 2539–40, 49 L.Ed.2d

451, by effectively insulating from transfer the inmate who once files a complaint against prison officials.[14]

Parenthetically, we cannot but remark on the singularity of the jury's finding an improper motive on the part of Vinzant, who was not named as a defendant in the original suit, while absolving Pastorello, who was named, and who acknowledged responsibility for the request and for furnishing the reason. If the reason was false, Pastorello should have been held liable. If it was sound, there was no basis for charging Vinzant for accepting it. Cf. Mt. Healthy City School Dist. Board of Ed. v. Doyle, 1977, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471. But quite aside from this, there is substantial question whether Vinzant even participated. The complaint was delivered for mailing a week before he came to Walpole. While Pastorello testified that he sought transfer approval of the "superintendent" "through channels," he was not asked, and did not say, which superintendent this was. Chronologically, it could have been either.[15]

As we noted in McDonald, ante, a prisoner, in making a circumstantial case that he was transferred for improper reasons, has a heavy burden. Even a lesser burden cannot be met by proof of "[c]ircumstances equally consistent with several hypotheses." Mutual Life Ins. Co. v. Hess, 5 Cir., 1947, 161 F.2d 1, 4; see NLRB v. Patrick Plaza Dodge, Inc., 4 Cir., 1975, 522 F.2d 804, 809. Viewing this record as a whole, we agree with the district court that it offered no more than speculation and conjecture as to either action, or bad faith, on the part of Vinzant.

Walter Moquin (Bridgewater) (September 1973—April 1974)

Plaintiff's supplemental complaint, in addition to asserting the transfer claim,

---

13. "On Sept. 13, 1973, at my request, he was transferred to M.C.I. Bridgewater to the Hospital & Drug Unit for treatment."

14. Indeed, our reference in McDonald to the appropriateness of summary judgment cannot be understood in any way except as suggesting that what will do on motion to dismiss will not satisfy a plaintiff's ultimate burden of production.

15. Pastorello testified he could not remember how much time passed between the request and the transfer, but thought it might have been "a week or ten days, two weeks." Vinzant had been at Walpole five days when plaintiff wrote the court that he had been notified of the impending transfer; eight days when it occurred.

charged various prison officials with the disappearance of his legal materials. Ultimately, only Charles Gaughan and Walter Moquin, Supervising Correctional Officer in charge of Bridgewater's Addiction Center Hospital, were put to the jury. The court declined to pass on these defendants' motions for directed verdicts, expressing the view that plaintiff's evidence was exceedingly thin, but that it would be desirable to have a verdict, in the event of an appeal. The jury found against Moquin, and in favor of Gaughan. The court thereafter set the verdict against Moquin aside. From the latter, plaintiff appeals.

▉ We agree with the district court. Plaintiff's first obligation was to show that the papers came into Moquin's possession or control. He received no help in this regard from Moquin. Moquin testified that the effects of a transferred inmate would ordinarily be sent to Bridgewater's "BX unit"—not under his control—for storage; that he would send for them on the inmate's request; that he determined what an inmate was allowed to have in his cell; that he did not remember plaintiff asking for the materials, and that there were no restrictions on legal materials in a prisoner's cell. Another Bridgewater guard testified that on Layne's request he searched the BX unit for Layne's law books, and found none. Ultimately some, but not all, of plaintiff's law books were found in storage, but not his papers.

Plaintiff's own testimony on the subject was cryptic.

Q. "Did Walter Moquin have anything to do with attempting to locate any of your legal papers?"

A. "No, not that I know of."

Q. "Did he at any time have anything to do with deciding what material you would be entitled to get?"

. . . .

Q. "If you know?"

A. "Yes. He told me that I couldn't have anything, (sic) that he wouldn't let me have very much."

The testimony does not give a time frame, nor does it suggest whether Moquin was referring to the pilfered materials, or to the materials that were eventually returned.

For all that appears, the papers never left Walpole. Had they come, there was no evidence that Moquin would have been the one to receive them, and, not named in the original complaint, he would have had no motive to search them out. We agree with the district court that there was no affirmative basis for finding that he was responsible for their nonappearance.

*Charles W. Gaughan (Bridgewater)* (September 1973—April 1974)

Although in general we resist commenting upon plaintiff's brief, we cannot avoid doing so with respect to the charges against Gaughan for this second incarceration at Bridgewater as summarized in the reply brief. We quote from page 6 of that brief, footnotes omitted.

"Layne was again in Gaughan's custody from August, (sic) 1973 to April, 1974. Gaughan was then reminded of Layne's plight because Layne had appealed to him personally and had served him with two sets of detailed *pro se* pleadings. Yet the only positive action Gaughan took was to transfer Layne back to Walpole to punish him for sleeping late and surliness. Gaughan's arrogant disregard of this lawsuit flouted the court as well as Layne himself."

With respect to the "detailed pleadings," the only details concerning Gaughan, or Bridgewater as a whole, were the charge of plaintiff's improper removal from Mass. General (long past, and difficult to be arrogant about), the fact that confinement in the hospital section kept him from freedom afforded the general population, and the deprivation of his legal papers for which Gaughan was absolved by the jury. As to the personal appeal, plaintiff's entire testimony was as follows.

Q. "During April '73 and '74[16] did you ever have any chance to contact Charles Gaughan?"

---

**16.** This is apparently a reporter's error for between August (or September) '73 and April '74.

A. "I saw him once."

Q. "What took place on—"

A. "I tried to talk to him. I didn't have much chance to speak to him, because someone called him away."

Q. "What, if anything, did you speak to him about?"

A. "I spoke to him about the ward I was in and no access to the rest of the institution and my physical condition."

Pursuit of that complaint would have led to a unanimity of views of fault on the part of the plaintiff. Five doctors, the Supervisor of Nurses, and Moquin signed a letter addressed to Gaughan dated March 27, 1974.

March 27, 1974

To: Charles W. Gaughan, Superintendent

Conditions have reached the point where a Conference was held yesterday by the Medical Staff, all of whom were present as well as Mr. Walter Moquin, Supervising Corr. Officer of the Add. Center Hospital, and Miss Mary Philbin, Supervisor of Nurses.

The conference, while dealing with problems in general, actually focused on two (2) of our Inmates, Warren Stanton BX–1502, and one Robert Layne BX–1690.

The above referred to are a constant source of trouble to all parties concerned; the Medical and Nursing Staffs, Correction, and other Inmates. To cite a few examples, they both watch their TVs until the early hours of the morning, are consequently asleep when the Doctor and Mr. Moquin make their rounds between 8 and 8:30 A.M., get up at their leisure (usually around 9:30 or 10 A.M.) and then demand their breakfast—and get it.

Further, these two men are constantly demanding medication at all hours of the day and night; not necessarily medication prescribed, but medication *they* want. Conversely, when the mood strikes them they refuse medication, usually in an arrogant and surly manner, stating either that they just don't want it, or it isn't what they want.

The aforementioned merely touches on the attitude and demeanor of these two men however a lengthy and detailed day by day summary of their actions would be redundant serve, no useful purpose.

In conclusion, the feeling of all those in attendance at said Conference was and is that such conduct on the part of these two Inmates, should not and cannot be tolerated any longer.

This leaves us with no alternative other than to respectfully request as well as strongly recommend that these two men be brought before the Classification Board for whatever action it may deem necessary and expedient under the circumstances.

| | |
|---|---|
| Dr. Craig | Dr. Reddy |
| Dr. Gatti | Dr. J. Aviles |
| Dr. Caravana | Mr. Walter Moquin, Supervisor, Add. Centr. Hosp. |
| Miss Philbin, R.N. | |

█ No doubt it was this letter that prompted the complaint in plaintiff's brief that he was transferred "back to Walpole to punish him for surliness," a charge overlooking the fact that plaintiff was the one who requested the transfer and which request was passed on in a letter dated April 3, 1974 from Gaughan to Commissioner Hall who approved it, post, not to mention the fact that plaintiff had previously charged that his transfer *from* Walpole *to* Bridgewater was for punishment.

█ It is true that as early as 1972 a Dr. Lebeaux had recommended physiotherapy for plaintiff, and that it became ultimately apparent, what between insufficient facilities and lack of uniform cooperation by plaintiff,[17] that plaintiff was not making progress at Bridgewater. Again, see letter of April 3. This came to a head upon his return to Walpole, but we do not find the prior record sufficient to charge Gaughan with wilful indifference.

█ Before leaving Gaughan we comment briefly on the matter of the alleged confiscation of plaintiff's leg brace. Plain-

17. The records contain numerous reports of plaintiff's non-cooperation. Plaintiff denied their truthfulness at trial, but what supervisors had to go on were records.

tiff's brief charges Gaughan with allowing him to "languish in his wheelchair, much of the time without even being permitted to use his leg brace." Defendants' witnesses testified that this did not happen. The only contrary evidence was plaintiff's testimony charging the deprivation to Moquin, not Gaughan. Not only did Moquin deny it had happened, but the jury absolved him of mistreatment.

*Douglas Vinzant (Walpole)* (April—December 1974) [18]

Plaintiff arrived back at Walpole on April 4, 1974, and was placed back in the infirmary in Dr. Pastorello's charge. The latter discharged him, over his protest, to the general population after a few days, saying he did not want him in the infirmary any more because he was being uncooperative. A letter to Vinzant dated April 25, 1974 reads as follows.

Mr. Douglas Vinzant April 25, 1974
Superintendent
M.C.I. Walpole Re: Inmate Robert M. Layne

Dear Sir:

I am submitting the following information regarding inmate Robert M. Layne who was transferred back to M.C.I. Walpole from M.C.I. Bridgewater on April 5, 1974.

This inmate was confined as a patient in the infirmary when I assumed duty here in November, 1972. I was informed that he had been in the infirmary since about July, 1972, having been sent here from M.C.I. Norfolk.

On physical examination, he was found to have a left side hemi-paresis which he attributed to severe head injuries sustained from a beating by the police. This inmate was confined to a wheel chair. His daily activities consisted of lying in bed all the a.m. and part of the afternoon. His meals, breakfast and lunch, were brought to his room and remained there uneaten ninety-nine percent (99%) of the time. When he finally did arise, he spent the remainder of the day in his wheel chair. Usually he stayed up very late into the evening and often after midnight.

As physician here, I made many efforts to rehabilitate him. He was sent to the New England Medical Center Hospital for special tests; admitted to Lakeville Hospital for ambulatory training and self-care; transferred to M.C.I. Norfolk Hospital for further training and care and finally returned back to the infirmary at M.C.I. Walpole.

I again tried to rehabilitate and help him become independent in all activities of daily living and ambulation with leg brace and cane. He resisted all efforts to do so. He resumed his routine of lying in bed all the a.m. and part of the p.m., then up all night; engaging in activities which were contrary to administrative and medical directives.

On September 13, 1973, at my request, he was transferred to M.C.I. Bridgewater to the Hospital and Drug Unit for treatment. He remained there from that date to April 5, 1974 when he was sent back to Walpole.

A copy of the letter I received from Bridgewater regarding his daily activities while there is attached to this report. I believe it is self-explanatory.

Since his return to Walpole, he has again resumed his usual role of remaining in bed all a.m. and wheel chair in p.m. I kept him in the infirmary for five days (April 5—April 10) and then discharged him to population.

This inmate is in a wheel chair. It is very difficult for him to get into or out of his cell without marked difficulty and without help from other inmates. In addition, in the population block, there is no way that he can bathe except from the lavatory bowl in his cell. Because of the above conditions he doesn't get to his meals in the dining room; never bathes himself, etc.

---

**18.** It does not appear precisely how long Vinzant was at Walpole. The only evidence was "up until 1975." In his summation to the jury counsel put it "the end of 1974." We do not accept the charge in plaintiff's brief that the jury could have found Vinzant responsible for a new segregation system, allegedly disadvantaging plaintiff, that was started in January, 1975. On the other hand, plaintiff named no Walpole superintendents from 1975 on.

When I have visited him in the cell block in the a.m. he has always been asleep in bed.

He is not receiving any physiotherapy nor any rehabilitative treatment because it is impossible to do so at this institution.[19]

Here he will do nothing to help himself although he states he wants to.

This inmate does not belong at M.C.I. Walpole. He should be transferred to M.C.I. Norfolk or to some other institution better able to help him.

I strongly recommend this and urge you to consider him for transfer as soon as possible.

I will be pleased to discuss this case in more detail with you if you so desire.

Very respectfully submitted,

Ernest J. Pastorello, M.D.
1 Attachment Senior Physician

Plaintiff was not transferred. What is more to the present point, Pastorello did not testify to any response from Vinzant to this letter, and Vinzant did not testify at all. Not only is it the first independent record, apart from Gaughan's letter to Hall earlier that same month,[20] of a substantial failure to supply plaintiff with treatment,[21] it was very strong stuff that properly put the ball, so to speak, in Vinzant's court. If Vinzant reviewed the record, some of which we have quoted, he would have seen that plaintiff, early diagnosed as a schizophrenic paranoid type, was a constant complainer, beginning with his entirely proper discharge from the Massachusetts General Hospital. As early as March, 1972 he was refusing such therapy that was offered him, and by the time of Dr. Pastorello's arrival on the scene in No-

vember, 1972, he was a noncooperative "resist[or]" of all efforts." (Letter of 4/25/74, paragraph 5). Various transfers had done no good. If Vinzant had testified that, for the various reasons of record, including those in Dr. Pastorello's very letter, he could think of nothing new to try, or worth the special expense of trying, one might find such conclusions warranted. It was perhaps natural for Dr. Pastorello, who had become entirely discouraged with plaintiff in the Walpole hospital facility, to suggest Norfolk, but against this the record of plaintiff's initial treatment at Norfolk showed he had insisted on being discharged against advice, and his later, six day stay in transit was scarcely encouraging.[22] As to Pastorello's suggestion of other institutions, the Massachusetts Rehabilitation Commission had refused to take him. Massachusetts General Hospital after only four days was happy to see him go. With a history of mental disorder and a heavy sentence for kidnapping and violent assault, plaintiff could not easily be shipped off to a private institution, even assuming there were such that could help him. Even in his complaint plaintiff asserted that Lakeville "was nervous about having a convicted prisoner from a prison with the reputation of Walpole . . . . As far as plaintiff can determine, no other prison inmate has ever been admitted to that hospital for therapy." Apart from this was the expense of a 24-hour guard detail, in eight-hour shifts. Another institution wanted $1,000 a week, presumably apart from the guards. In sum, it was easy to say plaintiff should be transferred, but the evidence surely supported the statements in Dr. Pastorello's letter indicating no apparent solution.

**19.** Pastorello sought to explain the absoluteness of this at the trial, but was cut off.

**20.** "Subject has a paralyzed left arm and a partially paralyzed left leg. He spends his time in a wheelchair in a restricted area in our hospital. In this setting there are no institutional programs available to him. Subject claims he functioned well at MCI-Walpole and that there were more program opportunities available to him there."

**21.** For example, as distinguished from plaintiff's claim that his February, 1973 discharge

from Lakeville Sanitarium was premature, the Sanitarium doctor's report was, "Patient has received maximum benefit from this hospitalization."

**22.** Significantly, this was when plaintiff had just received Lakeville Sanitarium's training and instruction on what to do to better his physical condition. Instead, the record reveals that he "stay[ed] in bed most of the time, and seems unwilling to move about," just as Dr. Pastorello was constantly noting.

However, while concededly Vinzant received Dr. Pastorello's letter, he failed to give the jury his appraisal, and the extent of his thinking. We cannot say, in the light of the forcefulness of Dr. Pastorello's expressed opinion, for the jury to have wanted to hear what that thinking was, and to assess liability in its absence, was entirely unreasonable.

At the same time, we do not disagree with the district court's view that the obstacles facing Vinzant were so apparent that he was not chargeable with punitive damages for concluding to do nothing. In charging the jury on liability the court properly stated that it was plaintiff's burden to prove deliberate indifference to a serious medical need. Punitive damages, it said, required action "intentionally malicious, or with reckless disregard.... I am distinguishing reckless disregard or malicious conduct from deliberate indifference." We agree that the standard for awarding punitive damages is properly higher than the standard governing compensatory damages in this context. We need not specify at this time whether that additional component is properly termed willfulness, outrageousness, or maliciousness. *Cf. Alicea Rosado v. Garcia Santiago*, 1 Cir., 1977, 562 F.2d 114, 121. We do not accept the contrary view of the Fifth Circuit in *Fielder v. Bosshard*, 5 Cir., 1979, 590 F.2d 105.[23] In the present case, in light of the difficulties facing Vinzant as to what could be done with plaintiff, any doubts we would have would be as to the propriety of a finding of conscious indifference, rather than as to finding his conduct malicious. We agree with the district court's setting aside the punitive award.

*Frank Hall, Commissioner of Corrections* (Oct. 1, 1973 to date of trial.)

Plaintiff's entire case against Hall is so shortly (but fully) stated in plaintiff's Reply Brief, that we copy it in full, adding our comment.

"In quick succession, Hall received the Supplemental Complaint [12] and the letter from Gaughan requesting that Layne be removed from Bridgewater.[13] In response, he transferred Layne back to Walpole.[14] Hall later received [15] letters from Layne requesting needed medical treatment. Yet he took no action. Again, from Hall's conduct it could be inferred that he maliciously or recklessly disregarded Layne's need for treatment, *Fults v. Pearsall, supra,* an inference supported by his failure to testify, McCormack *supra.*"

Footnote 12 referred to the principle that a mailed letter is presumably received. It did not mention the fact that the Supplemental Complaint, if read, would have alerted Hall to the fact that plaintiff did not like conditions at Bridgewater and preferred Walpole. Footnote 13, correspondingly, would have shown that plaintiff was requesting to be returned to Walpole. Footnote 14 showed that Hall acceded promptly to the transfer, scarcely a basis for criticism.

Footnote 15 refers to plaintiff's testimony that he wrote Hall from Bridgewater and "several other times after being in Walpole." No letters were ever produced. Beyond plaintiff's statement that they related to his "condition," there was nothing to show their contents, or their reasonableness on their face, or the dates.

Admittedly Hall took no action (after acceding to plaintiff's transfer back to Walpole) so far as the record shows, but this is scarcely comparable to plaintiff's cited case, *Fults v. Pearsall,* E.D.Tenn., 1975, 408 F.Supp. 1164, in which malice was inferred from a deputy sheriff's shooting a believed misdemeanant to prevent his escape.

Manifestly the Commissioner of Corrections, with his broad responsibilities over an entire state prison system, is and must be remote from individual prisoners unless something striking is brought to his attention. If he knew the contents of the original complaint, he knew it related to events prior to his taking office. Having read the Supplemental Complaint, he knew its thrust was punishment and denial of access to the

---

**23.** It is not altogether clear from the court's language whether it put too high a burden on simple liability, or set too low a one for punitive.

courts by being sent to Bridgewater, a matter he acted promptly to correct. If he looked into subsequent Walpole records—plaintiff's evidence, although he named no Walpole defendants except Dr. Pastorello after 1974, was extensive as to his being kept in the restricted B block instead of the freer A section—he would find continuous reports of plaintiff's refusing even to appear before the Classification Board. Plaintiff's testimony was that he did not appear because he had been told by one Vose he would not be moved into the A section until he dropped his suit. Vose, not a defendant, but as a witness at trial, denied this, and if the matter were important, it is to be noted that he was a member of the Board for a very short time.

 From the standpoint of top echelon inquiry, naturally this now asserted excuse for the long continuous non-prosecution of complaints to the Classification Board was in no way apparent on the record. We find no basis for charging Hall with wilful indifference to improper treatment.

As a result of the foregoing, the court's actions in directing verdicts are in each instance sustained. Its refusal to direct verdicts for Gaughan and Hall are reversed, and judgments are to be entered in favor of all defendants except as to Vinzant on issue 1 as put to the jury: the violation of a duty to plaintiff by deliberate indifference to a serious medical need.

This last possibly raises a question which no party addressed at the time, nor has it been adverted to since. For reasons that do not appear, after putting issue 1 to the jury, listing—with a check space for each—all nine defendants, the court's jury form put the following.

"1A—If you answered 'Yes' to one or more of the above named defendants, what *amount* of compensatory damages do you award? Please answer in words and figures." (Emphasis supplied.)

Consistent thereto space was provided for a single answer. As previously recounted,

the jury checked Yes as to three defendants on issue 1, and answered 1A $75,000.

The period during which plaintiff was in Gaughan's custody ran from September, 1971 to June, 1972, (with a brief interval) and again from September, 1973 to April, 1974. Plaintiff was in Hall's overall custody from October, 1973 to the date of the trial, January, 1980, a total of eight years. Vinzant's only connection was during the nine months of April to December, 1974. Under principles familiar to lawyers, but presumably not to the jurors, who were given no instruction on the subject, the effect of the answer was to charge each of the three ultimately designated defendants jointly and severally with the full figure.[24] Accordingly, Vinzant now stands liable for $75,000. Whether, in the light of our decision herein the district court should take further action under F.R.C.P. 60(b) we leave to it on remand, expressing no opinion of our own.

Affirmed in part, reversed in part, and remanded.

---

24. Fly-specking the charge, the court in no way suggested that the defendants might be jointly liable as having acted in concert, but stated, in connection with question 1, "[Y]our search here has to be separate with respect to each of the named defendants." The evidence would not have warranted anything else.