Harry GRAYSON, Plaintiff, Appellant,

v.

PRIDE GOLF TEE COMPANY, Defendant, Appellee.

No. 7615.

United States Court of Appeals, First Circuit.

Nov. 18, 1970.

Albert P. Zabin, Boston, Mass., with whom Joseph Schneider and Schneider & Reilly, Boston, Mass., were on brief, for appellant.

Lane McGovern, Boston, Mass., with whom Ropes & Gray, Boston, Mass., was on brief, for appellee.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

COFFIN, Circuit Judge.

Plaintiff brought this action for breach of an oral contract of lifetime employment. At the close of plaintiff's case the district court granted defendant's motion for directed verdict. We affirm. Our affirmance of such a disposition of what would ordinarily be a case for a jury requires a comprehensive statement of the evidence.

Plaintiff in 1957 was, through a corporation, General Products Corporation, in the business of making and selling golfing accessories. For four years, 1958 through 1961, plaintiff bought and resold golf tees made by Eugene Pride, predecessor of defendant corporation. At first Pride shipped the tees to plaintiff's Boston office, but subsequently shipped directly to plaintiff's customers. By late 1961 Pride wished also to bill the customers directly. After extensive negotiations, a seven year written contract was signed in January 1962, under which plaintiff, instead of buying and reselling at a mark-up, would be Pride's exclusive selling agent and would draw a commission on all sales of tees. Although not excepted by the contract's terms, the billing to the largest buyer, Wilson Sporting Goods Co., continued to be made through General Products, at plaintiff's insistence. The price billed by Pride to General Products was the price billed by General Products to Wilson. Plaintiff's compensation was not through mark-up but, as with all other sales, through commission.

By late 1963 Pride wanted to bill Wilson directly and wrote plaintiff to this effect. Plaintiff wrote two letters to Pride in which he said that the request for a billing change in the middle of the selling season was untimely; that he had just straightened out some "irritants" and that a new problem might jeopardize the account; that the matter could await discussion with Wilson's representative at a forthcoming Sporting Goods Show; and that Pride should wait for a change "another few months until the end of the season."

Two months later, in February 1964, Pride, and Wilson's golf tee purchasing agent, one McCracken, held a luncheon conference at the Sporting Goods Show in Chicago. Plaintiff testified that, when Pride broached the subject of his billing Wilson directly, McCracken said he had no problem with the present set-up and that Wilson could not change in the midst of a selling season. Pride then, according to plaintiff, attempted to assure McCracken that plaintiff "is not going to lose out by any change in the arrangement because he is going to get paid always." Pride allegedly asked plaintiff if he were not satisfied, to which plaintiff replied that he was "very unhappy", Pride then saying, "Well, we change the billing. * * * As long as we make tees you will represent us and sell all the tees we make. * * * You can have that if we change the billing." Plaintiff said that under these conditions he would "go along with it" and that McCracken had also agreed with the change, to be effective the next September. Pride confirmed saying that plaintiff would continue to receive commissions on tees, and admitted that he had used the word "always".

Shortly after this conversation, the Wilson representative wrote plaintiff, saying "I think we got everything pretty well straightened out with regards to the tee situation, and we will continue to operate in the future as we have in the past." A month later Pride wrote plaintiff a letter, complaining about his having, at the Chicago meeting, done "everything in your power to undercut the possibility of reaching an agreement with Wilson"; announcing his plans to bill directly as of September 1, 1964; and saying that if plaintiff could not "get the O.K. from Mr. McCracken we will not ship * * * [even] [i]f it means that we loose [sic] any part or all of this business." Three months later, on June 22, 1964, Pride wrote plaintiff again, repeating his unilateral plans for changing the billing, asking plaintiff to contact McCracken before August 15 or else he, Pride, would do so, and concluding by saying that if McCracken were planning to discontinue doing business with Pride, he would not order the additional equipment which he had tentatively planned to get. Plaintiff does not appear to have answered the first letter. To the second he replied merely that he would "advise you as to what takes place".

The billing change was finally effected as of September 1, 1964. In the meantime the defendant corporation came into being. Four years passed. In August 1968 plaintiff visited defendant corporation in Maine at which time Pride, according to plaintiff, announced that defendant was not going to renew plaintiff's contract after December. Plaintiff then said that the contract was amended in 1964 to which Pride allegedly replied, "Well, it isn't in writing." In October, after seeing counsel, plaintiff wrote defendant, for the first time referring in writing to the contract for permanent employment. Suit followed, leading to the directed verdict for defendant.

Courts view oral lifetime employment contracts with suspicion,[1] and we have carefully scrutinized plaintiff's evidence. Plaintiff argues that his version of the Chicago luncheon conference entitled him to have a jury decide whether or not the 1962 written contract had been orally revised into a lifetime employment contract. While this cannot be dismissed as a mere scintilla, cf. Magnat Corp. v. B & B Electroplating Co., Inc., 358 F.2d 794 (1st Cir. 1966), the relevant parts of the record at the conclusion of plaintiff's case effectively foreclose a jury issue. In determining the relevant evidence, we consider only plaintiff's own description of the alleged agreement and unrebutted documentary evidence. The latter we deem so indisputable and so inconsistent with the former as to have required the court's action of directing a verdict. Dehydrating Process Co. v. A. O. Smith Corp., 292 F.2d 653 n. 6 (1st Cir. 1961), cert. denied, 368 U.S. 931, 82 S.Ct. 368, 7 L.Ed.2d 194 (1961); Naumkeag Theatres Co. v. New England Theatres, Inc., 345 F.2d 910 (1st Cir. 1965); Pence v. United States, 316 U.S. 332, 340, 62 S.Ct. 1080, 86 L.Ed. 1510 (1942).

■ Taking the evidence relating to the Chicago luncheon most favorably to plaintiff, we assume that Pride in seeking to reassure both plaintiff and McCracken said in effect that plaintiff would "always" receive commissions on tees sold to Wilson. But for this statement to leave the category of unilateralism and enter the sphere of agreement, there must be a complementary undertaking. The nature of that undertaking as described by plaintiff was an understanding reached by all three participants that as of the following September the method of billing would be changed.

According to plaintiff, McCracken was indifferent about the proposed billing change and sought to insure that the change would not damage plaintiff in any way. McCracken indicated to Pride

---

1. *See* Judge Medina's discussion of judicial hostility toward such contracts, Lee v.

Jenkins Brothers, 268 F.2d 357, 368–369 (2d Cir. 1959).

that he was therefore reluctant to agree to the proposed change unless plaintiff was also willing to go along. The implication was that if plaintiff did agree, McCracken would go along and the billing change would be implemented when it was most convenient for Wilson. In order to persuade plaintiff, Pride is supposed to have made the offer of permanent employment, plaintiff is supposed to have accepted it, and McCracken was then supposed to have agreed to the billing change which would be put into effect the following September.[2]

That this understanding, particularly as it involved the party from whom Pride sought the change, Wilson, could not have been reached is established by the mute testimony of three letters. The first was from McCracken to plaintiff three weeks after the luncheon, concluding with "we will continue to operate in the future as we have in the past."[3] This was followed by Pride's letter in March saying "If you can't get the O.K. from McCracken we will not ship", urging plaintiff to "get Mr. McCracken to see that it is not unreasonable for the Manufacturer to bill his product direct", and indicating that Pride would be willing to lose the business if direct billing were not put into effect. Two months later, on June 22, almost five months after the luncheon, the questions of the billing and the possible loss of the Wilson business were still unresolved. And all that plaintiff wrote—in connection with the understanding that had supposedly

been arrived at in February—was that he would "advise [Pride] as to what takes place."

■ Plaintiff puts forth another interpretation of the alleged oral agreement on appeal. Under that interpretation, the factor of McCracken's willingness to accept the billing change is not present, and Pride is alleged to have offered permanent employment to plaintiff solely in exchange for plaintiff's willingness to "go along" with the proposed change. In addition to being highly implausible and putting strain on the concept of a complementary undertaking, this interpretation assumes that a jury could properly reject plaintiff's testimony of a three way deal, see note 2, supra, and substitute the alternative and inconsistent theory of a two party arrangement. In taking plaintiff's case in the best possible light, the district court is not required to consider theories inconsistent with the plaintiff's own version of the facts. It is possible that Pride might have extended such an offer to appellant in return for plaintiff's best effort to persuade McCracken and Wilson to agree to the new billing change, but the unrebutted documentary evidence indicates that rather than attempting to bring about the change, plaintiff attempted to frustrate the change to such an extent that Pride had to issue an ultimatum threatening to stop doing business with Wilson (which would have decreased plaintiff's commissions by a sig-

---

2. Excerpts from plaintiff's testimony make this clear:
   "Q. Mr. Grayson, it is your contention, as I understand it, that at this luncheon conference at the Palmer House, as part of this alleged contract you say that you agreed to permit Pride to bill directly to Wilson, is that correct?
   A. Yes.
   Q. So that deal was made right then and there?
   A. The understanding was.
   *　*　*　*　*
   Q. It had all been settled in February of 1964? It had all been agreed upon in 1964 that you would permit this?
   A. At the end of the selling season it would be changed.

   *　*　*　*　*
   Q. Actually no decision had been made, had it?
   A. You are wrong.
   *　*　*　*　*
   Q. Wilson had not agreed to do anything?
   A. Yes, they had. It was understood it was to be changed in September."

3. We observe also that McCracken's statement in the letter, referring to the luncheon conversation, that "I think we got everything pretty well straightened out" would rank as an unaccustomed understatement in the world of sales representatives if indeed a life contract had been settled.

**576**

nificant degree) before plaintiff made any effort to secure Wilson's agreement.

We do not think we are compelled, in passing on a directed verdict, to exclude from our field of vision unquestioned documents which conclusively negate plaintiff's testimony. The district court properly took the correspondence into account in ruling that plaintiff had made no case warranting jury deliberation.

The parties have extensively briefed the questions whether the terms of the luncheon conversation were definite enough to constitute a valid contract and, if so, whether defendant can be said to have adopted it. Our disposition of the case makes unnecessary the consideration of these issues.

Affirmed.