William J. KELLY, Plaintiff, Appellant,

v.

ALLIED CORPORATION and Bunker Ramo-Eltra Corporation, Defendants, Appellees.

No. 84–1727.

United States Court of Appeals, First Circuit.

Argued Jan. 9, 1985.

Decided Feb. 25, 1985.

---

** Judge Breyer believes that this court should not remand but should decide the merits of the appeal.

Andrew A. Caffrey, Jr., Andover, Mass., with whom Caffrey. & Caffrey, Andover, Mass., was on brief for plaintiff, appellant.

Nonnie S. Burnes, Boston, Mass., with whom Richard W. Renehan and Hill & Barlow, Boston, Mass., were on brief for defendants, appellees.

Before COFFIN, BOWNES and TORRUELLA, Circuit Judges.

COFFIN, Circuit Judge.

This case arises from a conflict over what was and was not said in a contract for commissions on the sale of computer equipment. Appellant, William J. Kelly, claims that the appellees, Mergenthaler Linotype Co. and its parent companies ("Mergenthaler"), owe him a $24,000 commission on the sale of a $1.6 million computer system even though Kelly quit his job at Mergenthaler before the computer system was shipped to the customer. A jury returned a verdict for Kelly, but the District Court for the District of Massachusetts granted the companies' motion for a judgment notwithstanding the verdict. We reverse.

The circumstances leading to this conflict began when Kelly was assigned to a new position at Mergenthaler in early 1982. Until that time, Kelly had served as National Sales Manager, Systems, a position in which he was responsible for eight or nine sales people who sold two types of computer systems, the System 325 and the M.C. 2000. Kelly earned a commission when a computer system sold by one of his sales force was shipped to the customer. The rules governing commissions applicable to both Kelly and his sales people, which were detailed on a separate page attached to their 1982 incentive compensation plans,[1] specified that commissions due upon shipment of merchandise would not be paid if the employee left the company before the shipment.

Apparently against his wishes, Kelly was switched to his new job as National Accounts Manager for System 5500 in March 1982. System 5500 is a large, complex computer system designed for individual customers, in this case newspapers, according to their specifications. Before Kelly assumed responsibility for the 5500, Mergenthaler had sold only two such systems in the United States. In contrast, about 35 to 50 System 325's were sold between June 1980 and December 1981.

At the time of his job change, Kelly received a memorandum entitled "System 5500 Incentive Compensation Plan" from Mergenthaler's vice-president in charge of sales which stated in its entirety:

"Effective March 22, 1982, a System 5500 Incentive Compensation Plan is in effect for your position. It's [sic] purpose is to encourage discussion of, stimulate sales activity on, and identify viable prospects for a System 5500.

The resultant sale of a System 5500 within the scope of your area of responsibility must have had your involvement in order to qualify for the Incentive Compensation Plan. This involvement MUST be verified by supporting written documentation attesting to your activity.

Upon the successful completion of a sale and subsequent shipment, you will be compensated as follows:

*1.5%* of the net value of the order."

During the spring of 1982, Kelly worked on the sale of a System 5500 to the Santa Ana Register, a newspaper in California, and his efforts contributed to the signing of a contract by early May. In June, Kelly left Mergenthaler to take a job at Itek Corp. In early 1983, he learned that the Santa Ana system had been shipped and contacted Mergenthaler to ask for his commission. The company refused to pay him, and Kelly commenced this suit.

---

1. A 1980 memorandum sent by Kelly to his sales force was in a different form but also contained the no-commission-on-termination rule.

Mergenthaler has argued that the memorandum Kelly received on the System 5500 Incentive Compensation Plan means that Kelly earned his commission on the sale of a System 5500 not when a sales contract was signed but only when the system was shipped. It supported that view by arguing that significant work remained to be done on a sale even after the contract signing. The company further argued that the rules that had governed Kelly and his employees in his former position—specifically the rule precluding commissions if the employee left before shipment—still applied to Kelly in his new job. Kelly argued that he was in a new position with new rules, and that the memorandum quoted above was the entire agreement between him and the company regarding his commission on the sale of System 5500s. He argued that his commission vested when a contract for sale was signed, although he was not to be paid the commission until after shipment. And he argued that termination would have no effect on his entitlement to the commission because this agreement failed to extend to his new position the rule which covered his old one.

After a 1½-day trial, a jury found in Kelly's favor. The district court, however, granted Mergenthaler a judgment notwithstanding the verdict because it found that the absence of language on the effect of termination in Kelly's new compensation plan could not be interpreted contrary to the company's past practice of withholding commissions when an employee left the company before shipment of the merchandise. It also found that "[t]he only reasonable construction of the agreement is that both ongoing 'involvement' and 'subsequent shipment' were conditions of the obligation of paying the 1.5% commission."

In granting a judgment notwithstanding the verdict, a court must determine "that the evidence could lead reasonable men to but one conclusion." *Hubbard v. Faros Fisheries, Inc.*, 626 F.2d 196, 199 (1st Cir. 1980). We do not believe this is such a case. Under New York law, which the parties agree is the applicable law in this case, "absent a clear agreement to the con-

trary, the right to . . . commissions vests at the time of booking." *Diaz v. Indian Head, Inc.*, 686 F.2d 558, 567 (7th Cir.1982) (applying New York law); *Grattan v. Societa per Azzioni Cotonificio Cantoni*, 2 Misc.2d 861, 151 N.Y.S.2d 875, 884 (1956); *Dibble v. Dimick*, 143 N.Y. 549, 38 N.E. 724 (1894). Mergenthaler correctly argued that New York law also provides that "where an employee resigns voluntarily, he is not entitled to receive commissions on sales made by him where the contract provides that such commissions shall be due and payable to the salesman when the shipments are made", *Maloney v. Jarco Metal Products Corp.*, Sup., 144 N.Y.S.2d 128, 131 (1955). But that is not the end of it. *Maloney* also specifies circumstances in which this general rule does not apply: "Where the major consideration in the earning of commissions is procurement of orders for the defendant, the employee is entitled to commissions on the sale he obtained during the period of his employment," *id.* at 132, citing *Krause, Inc. v. Gardner*, Sup., 99 N.Y.S.2d 592 (1950).

A key question for the factfinder, then, was whether the language in Kelly's compensation plan linking commissions to the time of shipment evidenced an intention that Kelly's right to commissions would not vest until that time or whether it was evidence only of an intention that shipping would be a condition precedent to *payment* of the commission. The second important question was whether, regardless of the commission's time of vesting, Kelly was subject to a rule that termination cut off any rights to outstanding commissions.

We acknowledge that certain evidence pointed to the district court's conclusion that Kelly was not entitled to the commission. The signing of the contract in a System 5500 sale was not the end of the work for a Mergenthaler salesman; Kelly testified that he did a significant amount of work subsequent to the signing of the contract on a previous sale of a System 5500, including visits to the newspaper in Albuquerque. Mergenthaler produced a document from Itek Corp., Kelly's new employ-

er, stating that Kelly had received a $15,000 hiring bonus in part to compensate him "for the loss of a large commission payment." The district court in this case undoubtedly viewed the evidence as a court faced with quite similar facts viewed the evidence in *Sommer v. Edward Ermold Co.*, 92 N.Y.S.2d 326, 275 App.Div. 629 (1949):

> "[T]he plaintiff was employed not as an ordinary salesman, but as the local sales manager in charge of a territory and responsible for servicing as well as the selling of the defendant's machines and parts. It is obvious that the plaintiff's discharge not allegedly wrongful put an end to all opportunity for servicing of defendant's product.
>
> .    .    .    .    .
>
> "Assuming some ambiguity in the arrangements for compensation as to the time when commissions were earned by the plaintiff, the evidence warrants a finding that the parties themselves gave a practical construction to their agreement so as to make clear an intention that commissions were due and payable only for goods shipped while the plaintiff was still in the defendant's employ."

Although we agree that this view of Kelly's situation at Mergenthaler is plausible, we do not believe the evidence leads inexorably to the conclusion that he gave up his commission when he left the company. First, we do not believe the language of Kelly's System 5500 Incentive Compensation Plan is consistent only with an intention that commissions would vest at the time of shipment. The purpose of the incentive plan was "to encourage discussion of, stimulate sales activity on, and identify viable prospects for" the computer system. As Kelly's attorney noted at oral argument, this language suggests that the company merely wanted Kelly "to open doors", although his reward would be postponed until the merchandise was shipped and, presumably, the company was paid for the computer system. This interpretation of his compensation plan is strengthened by Kelly's testimony about the work he did on the Albuquerque sale; despite his extensive involvement in the installation process of that system, he received no commission. Under Kelly's view of his compensation plan, he would not be entitled to commission on that sale because he had not been involved in the "opening doors" stage. In contrast, in *Sommer*, 92 N.Y.S.2d at 327, the court found that "the plaintiff was paid and accepted commissions under this contract on many orders obtained by others prior to the commencement of his employment, but which were filled after he entered the defendant's employ."

Second, the argument that the termination rule which covered Kelly in his old position also applied to his new one is undermined somewhat by differences in other aspects of the System 5500 compensation program. In addition to the termination policy, the previous set of rules specified that for an order to justify commission, it "must have a shipping date no later than six months from the date of order." The testimony showed, however, that there would be at least six or seven months from the time of order and time of shipment for the large and complex System 5500, and that the two previous sales by Mergenthaler were not shipped for at least one year. In addition, the requirement in Kelly's System 5500 compensation plan that his involvement in a sale be documented in writing was not a part of the previous rules. Moreover, the only document he received concerning his incentive compensation plan contained no reference to a termination policy, and that was unlike the practice the company had followed in his prior position, in which both he and his employees received explicit notice of the policy in the form of rules attached to their compensation plans. These differences mean that a reasonable juror could have adopted Kelly's argument that none of the old rules, including the one on termination, were applicable to his new position, that the System 5500 was a unique computer system with unique rules, and that the entire commission agreement was contained in the

brief memorandum Kelly received when he changed jobs.

Finally, with regard to the document stating that Kelly received a hiring bonus at Itek to compensate for a lost commission, Kelly testified that he asked for the bonus so that he could buy a car, since Mergenthaler had supplied him with one and Itek would not be doing so. At trial, the Itek employee relations director who testified that he had written the document based on information from others conceded that he had no personal knowledge of the basis for the commission statement. Thus, the jury was faced with Kelly's testimony about seeking the bonus for a car on the one hand and, on the other hand, no conflicting testimony from anyone with personal knowledge.[2]

From this review of the contract language and the testimony, we believe that this was not such a one-sided case that no reasonable jury could have found that Kelly was entitled to a commission on the Santa Ana sale. Although we acknowledge that the district court's view of the evidence was certainly a credible one, its decision to grant a judgment for Mergenthaler notwithstanding a jury verdict in Kelly's favor deprived the jury of its fact-finding function in a case in which the facts were susceptible of more than one reasonable interpretation.

*Accordingly, the judgment of the district court is reversed, and we remand this case for reinstatement of the jury verdict.*

---

2. This is not a situation in which "unquestioned documents ... conclusively negate plaintiff's testimony," *Grayson v. Pride Golf Tee Co.*, 433 F.2d 572 (1st Cir.1970). No one with personal knowledge of the commission statement testified; Kelly's testimony, in effect, was that the statement was inaccurate, and, even if accurate and supported by testimony based on personal knowledge, Itek's reason for agreeing to pay a bonus would not be determinative on whether Mergenthaler owed Kelly the commission.