The CHEDD–ANGIER PRODUCTION
CO., INC., Plaintiff, Appellee,

v.

OMNI PUBLICATIONS INTERNATION-
AL, LTD., Defendant, Appellant.

The CHEDD–ANGIER PRODUCTION
CO., INC., Plaintiff, Appellant,

v.

OMNI PUBLICATIONS INTERNATION-
AL, LTD., Defendant, Appellee.

Nos. 84–1129, 1142.

United States Court of Appeals,
First Circuit.

Argued Jan. 7, 1985.

Decided March 15, 1985.

Norman Roy Grutman, New York City, with whom Bernard J. Bonn, III, Dennis C. Hart, Jewel H. Bjork, Adrienne DeLuca, Testa, Hurwitz & Thibeault, Boston, Mass., and Grutman, Miller, Greenspoon, Hendler & Levin, New York City, were on brief for Omni Publications International, Ltd.

Craig E. Stewart, Boston, Mass., with whom Laurie S. Gill and Palmer & Dodge, Boston, Mass., were on brief for The Chedd-Angier Production Co., Inc.

Before COFFIN and ALDRICH, Circuit Judges, and GIGNOUX,* Senior District Judge.

COFFIN, Circuit Judge.

In a contract dispute between The Chedd-Angier Production Co., Inc. (Chedd-Angier) and Omni Publications International, Ltd. (Omni) over the production of a scientific television series, the jury awarded Chedd-Angier full contract damages, apparently concluding that Omni breached some agreement between the parties. Omni challenged the jury verdict on several grounds and now appeals from the denial of its motion for judgment notwithstanding the verdict or for new trial. In a companion case, Chedd-Angier appeals from the district court decision that Omni did not engage in unfair or deceptive acts or practices in violation of Mass.Gen.Laws Ann. ch. 93A, § 11. After a careful review of the record, we affirm the judgments below on all counts.

Omni, a New York corporation, is the publisher of *OMNI* magazine, a monthly publication devoted to developments in science, technology and medicine. Robert Guccione, the chairman of Omni, publishes the *OMNI* magazine and several sexually explicit adult magazines, including *Penthouse*. Chedd-Angier is a Massachusetts based film and television production company founded in 1980 by John Angier, its president, and Graham Chedd, its treasurer. The parties came together in the summer of 1980 when Guccione and Kathryn

* Of the District of Maine, sitting by designation.

Keeton, the president of Omni, decided to create a science and technology television program based on *OMNI* magazine, and Chedd-Angier was looking for corporate underwriters to finance a science television magazine series. After a number of meetings involving Guccione, Keeton, Chedd, Angier and David Rothkopf, an employee of Tilley, Marlieb and Alan, Inc., Omni's advertising agency, the parties entered into a two-page letter agreement on December 8, 1980 pursuant to which Chedd-Angier would produce a one-hour pilot television program "about science, technology and related subject areas", with the intention of producing "a successful and long-running TV series." The letter agreement further provided that:

> "If the pilot is completed and successful and seems to be the basis for a commercially viable series, then you [Omni] and we [Chedd-Angier] intend to continue forward to make the series, on terms that will be agreed at that time. If, on the other hand, the pilot is not completed or we cannot agree on terms, or the pilot is not a success, or if you do not wish to carry on working with us, or if we do not wish to carry on working with you, or if you or we see at any time the likelihood of a successful pilot is not worth additional expenditures, you will pay all costs incurred to date and then both you and we will be free to develop and produce independently any science programs that we are interested in, including those similar to the pilot."

The agreement provided for the production of a pilot using on-camera reporters, retaining for Guccione the "sole right of approval over the final cut of the program", "final selection" of the major elements of the program and even approval rights over "day to day operations." It also provided that any additional expenses had to be approved by Guccione or Keeton in advance.

In the weeks following the December 8 agreement Chedd-Angier began active work on production of the pilot and the series. At the same time, Omni began to market the proposed series in order to sell it to network or affiliate stations. Omni extensively advertised the series proclaiming it to be a joint effort from both the publishers of *OMNI* magazine and the Chedd-Angier production company, "the most acclaimed science producers in America."

In January, 1981, Omni requested that Chedd-Angier produce a promotional tape (Promo) for the program, and authorized payment of $45,000 for its production. In February, with a rough version of the Promo, Keeton, Rothkopf, Chedd and Angier met with representatives of the American Broadcasting Company (ABC) who expressed possible interest in purchasing the series. On March 5, Rothkopf telephoned Chedd-Angier and in words or substance said that ABC had agreed to air an Omni series—"It's a go on the series."

Guccione, not yet having approved of the promotional tape, met with Keeton, Rothkopf, Chedd and Angier on March 13 to view it for the first time. Apparently Guccione objected to aspects of the tape, including the use of reporters. Nevertheless, according to Angier, Keeton said that Guccione approved of the use of the reporters.

On March 17 Chedd-Angier sent a letter addressed to Guccione and Keeton outlining the proposed terms for production of the series which incorporated many of the terms and conditions agreed upon in the December 8 contract, including a producers' fee for Chedd-Angier of 15%. In addition, Chedd-Angier specifically requested approval to hire the two reporters who had appeared in the promotional tape. Neither Guccione nor Keeton ever signed the agreement, although on April 2 in a telephone conversation, Rothkopf accepted the proposed budget figures with some modification.

On April 4, 1981 Chedd and Angier met with Guccione and Keeton in New York to review creative aspects of the series, including a television set design which Guccione had commissioned from an Italian movie set designer. Chedd and Angier ob-

jected to the set because it was incompatible with the use of the reporter format. To Guccione's suggestion that perhaps Chedd-Angier "should consider not using reporters", Chedd and Angier replied that Guccione had previously agreed to the use of reporters, that it was too late to make the changes he was suggesting, that it would be too expensive, and that it was inconsistent with the contract and difficult if not impossible to do.

A memorandum written by Rothkopf to Keeton subsequent to this meeting suggests that as of April 9 Omni had decided not to use reporters, to terminate Chedd-Angier and to form their own production company. The memorandum indicated that Omni was exploring the viability of in-house production and was concerned about the effect of the proposed "change" in production company on ABC's decision regarding the series. Although Chedd-Angier was told on April 16 that Guccione was upset because they had objected to the dropping of the reporters, it was not until April 22 that Rothkopf, instructed by Guccione and Keeton, telephoned Chedd and Angier and informed them of Omni's decisions. He also asked them at that time for an accounting of the $212,000 that had been advanced by Omni.

One week later, on April 29, Chedd wrote a letter to *Discover* magazine, a science magazine published by Time, Inc., in which he stated that Chedd-Angier's only signed document with Omni "explicitly gives either party the right to terminate the arrangement at any time, and either party then has the right to do anything in the science field it wishes."

In its Memorandum and Order dated January 5, 1984 denying Omni's motion for judgment notwithstanding the verdict or for a new trial, the district court summarized the parties' positions:

"The entire course of conduct between the parties was marked by numerous meetings and communications. At trial, both defendant Omni and plaintiff Chedd-Angier introduced into evidence numerous exhibits in support of their respective positions. In substance, Chedd-Angier claims that Rothkopf, acting as Omni's agent, entered into an agreement with Chedd-Angier on March 5, 1981, for the production of the Omni series. Chedd-Angier claims that the entire course of dealing between the parties evidenced their intent to jointly produce the Omni series, and that Omni made oral expressions of agreement on terms for the production of the series on a number of occasions subsequent to March 5, 1981. Until notified of their termination, Chedd-Angier had been continually at work on the series. Omni claims, however, that the December 8, 1980 agreement, by its terms, controlled the rights and obligations of the parties to the end of their relationship and that, as a matter of law, there are no facts to support the allegation of a superseding oral contract for the series. Omni claims that the plaintiff's work for the series was performed at the assumed risk that it would not be asked to produce the series."

The case came to trial in October 1983. Six of the eight counts brought by Chedd-Angier were submitted to the jury. Count 1 alleged the breach of the December 8 agreement in which Chedd-Angier sought unreimbursed production costs and a production fee for its work on the promotional tape. Chedd-Angier claimed that the December 8 agreement was intended to cover production costs of the Promo as well as the pilot. On Count 2, Chedd-Angier sought contract damages of some $275,000 for breach of an oral contract to produce the television series.[1] The same damages were sought and were charged by the court for: breach of the duty of good faith and fair dealing (Count 3); promissory estoppel (Count 5); and misrepresentation (Count 7). On an implied-in-fact contract claim (Count

1. This figure is equivalent to fifteen percent of the production costs for the series, and is referred to by the parties as the "producers' fee".

4), the measure of damages was limited to the reasonable value of services rendered, or quantum meruit. The jury found in favor of Chedd-Angier on a general verdict and awarded $223,175.00 in damages. Finally, Chedd-Angier sought multiple damages predicated on unfair or deceptive acts and practices under Mass.Gen.Laws Ann. ch. 93A, § 11 (Count 6) and Omni counterclaimed to obtain an accounting for the money it advanced to Chedd-Angier under the December 8 agreement. These claims were tried to the district court, and judgment was entered against Chedd-Angier on the 93A claim, and against Omni on the counterclaim.

Omni raises principally four issues on appeal. First, Omni challenges the sufficiency of the evidence to support the jury's findings that there was an agreement—whether oral, written, implied-in-fact, or based on promissory estoppel—and that Omni breached that agreement, its duty of good faith under that agreement or knowingly misrepresented its intentions. Second, Omni claims that the district court committed prejudicial error in charging the jury that it must award full contract damages for the series should it find for Chedd-Angier on the counts of promissory estoppel, breach of duty of good faith or misrepresentation. Third, Omni contends that the trial court's failure to order an accounting for the $212,000 advanced to Chedd-Angier entitles Omni to a new trial. And finally Omni claims that the court's refusal to ask *voir dire* questions concerning Guccione's link to *Penthouse* magazine allowed jury bias to infect the fairness of the trial. Omni claims that on the basis of the trial errors and the sufficiency of the evidence claims, it is entitled to a judgment notwithstanding the verdict or a new trial.

■ Appellate review of a jury verdict is extremely restricted and should be granted cautiously and sparingly. To do otherwise deprives the party of a decision by jury. We are compelled, therefore, even in a close case, to uphold the verdict unless the facts and inferences, when viewed in the light most favorable to the party for whom

the jury held, point so strongly and overwhelmingly in favor of the movant that a reasonable jury could not have arrived at this conclusion. *Rios v. Empresas Lineas Maritimas Argentinas*, 575 F.2d 986, 989–90 (1st Cir.1978). Simply put, where it is possible to disagree about the outcome, the matter must go to the jury. *Dumas v. MacLean*, 404 F.2d 1062, 1064 (1st Cir. 1968).

■ Omni has failed to persuade us that the facts of this case so conclusively point to a verdict in its favor that fair-minded people could not disagree about the outcome. The evidence was as conflicting as it was voluminous and as such this case is not one, as the district court noted, "where there is but one reasonable conclusion as to the proper judgment." We accordingly uphold the district court judgment denying Omni's motion for judgment notwithstanding the verdict.

■ In the alternative, Omni contends that the district court abused its discretion in failing to grant its motion for a new trial. A new trial should be granted only where the court is convinced that the jury verdict was a "seriously erroneous result" and where denial of the motion will result in a "clear miscarriage of justice." *Coffran v. Hitchcock Clinic, Inc.*, 683 F.2d 5, 6 (1st Cir.1982). As the district court noted:

"New trials may be granted where the court determines that: the verdict is against the weight of the evidence; material issues were improperly submitted to or withdrawn from the jury; substantial errors were made in the admission or rejection of evidence or instructions to the jury; the jury acted with passion or prejudice or engaged in other misconduct; or the trial was otherwise unfair to the movant. 6A Moore's Federal Practice ¶ 59.08. A party is not entitled to a new trial merely because the evidence introduced at trial would have supported an opposite verdict. *Peterman v. Indian Motorcycle Co.*, 216 F.2d 289, 292–93 (1st Cir.1954); *Dumas v. MacLean, supra.* Nor should the judge set aside the

verdict merely because he would have reached a contrary result. *Peterman, supra,* at 292–93."

## I. *Sufficiency of the Evidence*

Omni argues on appeal that the district court erred in submitting the oral contract count to the jury because there was no proof that a binding contractual relationship existed between the parties. Omni contends that the parties had only reached the stage of "imperfect negotiation" with final terms still to be worked out. "Agreements to agree", they argue, are unenforceable.[2] *Blair v. Cifrino,* 355 Mass. 706, 247 N.E.2d 373 (1969); *Marine Midland Bank v. Herriott,* 10 Mass.App. 743, 412 N.E.2d 908 (1980); *Tull v. Mister Donut Development Corp.,* 7 Mass.App. 626, 389 N.E.2d 447 (1979). As proof that the parties were still in the "negotiation" stage in March and April, Omni points to documents which suggest that a written agreement was not only contemplated by the parties but was a required condition of contract formation. Omni claims that where the parties intend to draft legal documents, absent those documents no contractual relationship can exist. *Blair v. Cifrino,* 355 Mass. at 709, 247 N.E.2d at 375; *see Wasserman v. Roach,* 336 Mass. 564, 567–568, 146 N.E.2d 909 (1958).

■ Omni's analysis is correct as far as it goes. The problem, however, is that under Massachusetts law even where a writing was contemplated by the parties, if sufficient evidence exists to show that an oral contract has been entered into, the parties' intention to memorialize the contract in writing does not defeat the existence of an oral contract. *Kilham v. O'Connell,* 315 Mass. 721, 724–44, 54 N.E.2d 181 (1944); *see Merrill v. Kirkland Construction Co., Inc.,* 365 Mass. 110, 114, 310 N.E.2d 106 (1974); *Alphen v. Bryant's Market, Inc.,* 329 Mass. 540, 543, 109 N.E.2d 152 (1952); *Nigro v. Conti,* 319 Mass. 480, 482, 66 N.E.2d 353 (1946). The

Restatement of Contracts 2d, § 27 is in accord with this view:

"Manifestations of assent that are in themselves sufficient to conclude a contract will not be prevented from so operating by the fact that the parties also manifest an intention to prepare and adopt a written memorial thereof; but the circumstances may show that the agreements are preliminary negotiations."

■ The question then becomes one of fact, whether the jury had sufficient evidence before it to decide that the parties, intending to create a written contract, orally agreed upon the essential terms of the contract prior to memorializing the contract in writing. To answer this question, we again refer to the district court's January 5, 1984 Memorandum and Order.

The court specifically and supportably found that Chedd-Angier presented sufficient evidence of Rothkopf's apparent authority to act on behalf of Omni. Chedd-Angier was therefore justified in its reliance on Rothkopf's representations when he said "It's a go on the series" and when he later approved Angier's proposed budget. The court concluded that enough facts were before the jury for it to find that "the parties had an oral contract; all essential elements of the contract were agreed upon; and Omni never exercised its claimed creative control over the use of the reporter format but, instead, terminated Chedd-Angier in breach of the oral contract." While we are convinced that this was a close case, and one that equally could have been decided the other way, after extensive review of the record, we are persuaded that the district court did not abuse its discretion in denying Omni's motion for a new trial on the oral contract claim.

We are unpersuaded by Omni's remaining legal arguments on the oral contract issue. In particular, we reject Omni's contention that a directed verdict is mandated in this case on the basis of *Grayson v.*

---

**2.** Arguably, Massachusetts or New York law should apply in this diversity action. Because the parties have not drawn our attention to any

substantive differences in contract law in the two jurisdictions, for convenience we have chosen generally to apply Massachusetts law.

*Pride Golf Tee Company,* 433 F.2d 572 (1st Cir.1970). In *Grayson,* the plaintiff sued for breach of an oral contract of life-time employment. In that case, the district court directed the verdict for the defendant because undisputed documents in evidence were inconsistent with the plaintiff's theory of an oral contract. The documents showed that essential terms of the alleged oral agreement were still unresolved. *Id.* at 575. The documents in evidence in this case, however, can be read to support not just the defendant's theory, as in *Grayson,* but also the theory of the plaintiff's case. The jury had evidence before it that the essential terms of the contract had been agreed upon, if not by March 5 after Roth-kopf's telephone call to Chedd-Angier, or by March 13 when Keeton allegedly approved of the reporters, then certainly by April 2 when Rothkopf accepted Chedd-Angier's proposed budget for the series. *Grayson,* therefore, poses no bar to the submission of the contract counts to the jury.

Similarly, we reject Omni's contention that Chedd's statement in his April 29 letter to *Discover* magazine (*Discover* letter) is an admission by Chedd-Angier which is inconsistent with its theory that a superseding oral contract bound the parties. In that letter, written one week after Omni terminated Chedd-Angier, Chedd stated that no written contract binds Chedd-Angier and Omni. Chedd's failure to mention the superseding oral contract in the *Discover* letter is not fatal to Chedd-Angier's claim, however, because the letter was written *after* the alleged breach of the oral agreement. Accordingly, we do not believe that the existence of this letter requires reversal under *Grayson.*

Moreover, review of the record reveals that there was sufficient evidence to support submission to the jury on each of the remaining counts. The court below carefully summarized the evidence in support of each count submitted to the jury concluding that:

"[i]n view of the relatively simple issue that was at the core of the plaintiff's case, that the parties had actually or impliedly agreed that the plaintiff would produce the series, the evidence would amply support the award of damages based on the production of the series under several of the plaintiff's theories."

We believe that in its Memorandum and Order the district court competently evaluated the record and we adopt its discussion of the evidence as our own.

## II. *Errors in the Jury Instructions*

In the district court's charge to the jury, it instructed that the damages for promissory estoppel and breach of duty of good faith were the full measure of contract damages, an amount arguably equivalent to the fifteen percent producer's fee. Omni contends that under both theories only reliance damages are available, and therefore, in light of the general verdict, the erroneous damage charges were prejudicial and a new trial is warranted. Although we agree with Omni that an error in the jury instructions would be prejudicial, we are not persuaded that there was an error in this case.

To determine the proper measure of damages in this diversity action we apply Massachusetts law, *Segovia Development Corp. v. Constructora Maza, Inc.,* 628 F.2d 724, 726 n. 4 (1st Cir.1980), and in doing so, we are guided by the trial court's interpretation of that law, *Garcia v. Friesecke,* 597 F.2d 284, 295 (1st Cir.1979). Massachusetts has recently endorsed the theory of promissory estoppel, although it has chosen not to adopt the doctrine by name:

"When a promise is enforceable in whole or in part by virtue of reliance, it is a 'contract,' and it is enforceable pursuant to a 'traditional contract theory' antedating the modern doctrine of consideration. See *Sullivan v. O'Connor,* 363 Mass. 579, 588 n. 6, 296 N.E.2d 183 (1973); Restatement (Second) of Contracts § 90, Comment a (Tent. Drafts Nos. 1–7, 1973). We do not use the expression 'promissory estoppel,' since it tends to confusion rather than clarity." *Loranger Construction Corporation v. E.F. Hauser-*

*man Company*, 376 Mass. 757, 760, 384 N.E.2d 176, 179 (1978).

■ Under § 90 of the Restatement (Second) of Contracts, adopted in its tentative form by the Massachusetts court in *Loranger*, damages available under promissory estoppel range from full contract damages to reliance or restitution damages:

> "d. *Partial enforcement.* A promise binding under this section is a contract, and full-scale enforcement by normal remedies is often appropriate. But the same factors which bear on whether any relief should be granted also bear on the character and extent of the remedy. In particular, relief may sometimes be limited to restitution or to damages or specific relief measured by the extent of the promisee's reliance rather than by the terms of the promise." Restatement (Second) Contracts § 90, comment d.

The district court, therefore, was clearly authorized under Massachusetts law to charge contract damages for promissory estoppel; whether to charge full contract damages, or something less, is a matter of discretion delegated to the district court. We cannot say that the district court abused its discretion in this instance.

As to Omni's remaining claims of error in the jury instructions, we find them either to have been waived (measure of damages for misrepresentation), subsequently cured by the court (charge to the jury that the breach of duty of good faith requires a finding that no contract exists), or without merit (measure of damages for breach of duty of good faith).

## III. *Whether an Accounting was Warranted*

■ Omni sought an accounting for the $212,000 it advanced to Chedd-Angier under the December 8 agreement. The trial court rejected Omni's counterclaim concluding that the parties were connected only in an arms-length business relationship and not in a fiduciary relationship. Under Massachusetts law, an equitable accounting is available only if there exists a fiduciary or trust relationship between the parties, *Ball v. Harrison*, 314 Mass. 390, 50 N.E.2d 31 (1943), and we see nothing in the record to indicate that the commercial relationship between Omni and Chedd-Angier was transformed into one which was fiduciary in nature. *See Broomfield v. Kosow*, 349 Mass. 749, 212 N.E.2d 556 (1965). Accordingly, we agree with the district court that there was not that "degree of overbearance or ... inequity of positions between the parties" or "sufficient evidence of misappropriation of any funds" to require an accounting in this instance.

## IV. *Errors in Voir Dire*

Omni argues that the jury was biased as a result of its purported knowledge of Guccione's association with sexually explicit magazines and films. Omni claims it is entitled to a new trial because the court refused to allow *voir dire* questions concerning juror attitudes on these issues and refused to conduct an evidentiary hearing after the verdict was returned to investigate the scope of the juror's knowledge of Guccione's activities.

■ In a pre-trial motion *in limine*, Omni sought to exclude any mention of *Penthouse* magazine from the trial, or *in the alternative*, Omni requested individual *voir dire* to probe the private opinions of jury members regarding sexually explicit magazines and films. Having granted Omni's first request, the court declined to individually *voir dire* the jurors. We find no error in this decision.

The district court was successful in achieving Omni's alleged objective—disassociating the present contract dispute from Guccione's more controversial activity. In fact, we think that the court may have chosen the best means of achieving Omni's goal; eliciting jury bias through the extensive questioning proposed by Omni might have magnified the importance of Guccione's connection with the sexually explicit subject matter and so have been counterproductive.

Moreover, we believe that the trial court acted within its discretion in finding that the alleged evidence of juror bias, elicited through an "objective" telephone poll conducted by employees of Omni's counsel, did not warrant a post-trial evidentiary hearing to determine the extent of the jurors' knowledge regarding Guccione's other activities.

## V. *Mass.Gen.Laws Ann. ch. 93A*

Mass.Gen.Laws Ann. ch. 93A, § 11, provides that "[a]ny person who engages in the conduct of any trade or commerce and who suffers any loss of money ... as a result of the use or employment by another person who engages in any trade or commerce of an ... unfair or deceptive act or practice ... may ... bring an action ... for damages." Chedd-Angier alleges that Omni's action in terminating Chedd-Angier as producer of the series was an unfair and deceptive business practice in violation of Chapter 93A. Chedd-Angier bases its action on a claim of common law misrepresentation, *Levings v. Forbes & Wallace, Inc.,* 8 Mass.App. 498, 504, 396 N.E.2d 149, 154 (1979), and on the claim that Omni's actions in general were "unscrupulous". Omni contends that its practices were neither unfair nor deceptive, but moreover that it is exempt from liability under Chapter 93A.[3] The district court entered judgment in favor of Omni:

"I am persuaded from the facts here that both parties had a legitimate dispute over the composition of this agreement. I do not disagree, and I accept the jury's verdict as to the contract itself. But I do not find any act of deception in Omni's response to the negotiations that went on between the parties. I think the matter can be fairly described as a falling out over a legitimate dispute as to control, perhaps, and a clash of artistic egos; but not such conduct or rascality as would disturb me. So I find and rule that on that count that there was no fraud, there was no unfair, deceptive acts and practices, and judgment on Count 6 will enter in favor of the defendant."

The record makes it abundantly clear that Omni's behavior in its relations with Chedd-Angier does not rise to the level of 93A liability. Chedd-Angier claims that Omni made numerous fraudulent misrepresentations and in reliance on those representations, Chedd-Angier expended time and money to its detriment. Specifically Chedd-Angier refers to the apparent inconsistency between the promotional material distributed by Omni, which referred to Chedd-Angier as the producer of a reporter format science series, and statements made by Omni at trial to the effect that a final decision had not been made prior to April 4 as to who would produce the series and whether a reporter format would be utilized. Additionally, Chedd-Angier alleges that Omni unfairly took advantage of Chedd-Angier's reputation and expertise in order to sell the series, intending all the while to produce the series in-house. Omni's delay in terminating Chedd-Angier, they claim, attests to Omni's fraudulent intentions.

Chedd-Angier's recitation of the events, however, omits certain crucial information. For example, the December 8 letter agreement expressly provided for extensive marketing of the proposed series. The parties agreed at that time to provide the advertising agents "with the promotional tapes and materials that they need, using as far as possible elements that we have developed for the pilot itself." At the time of the December 8 agreement the parties envisioned production of a reporter format series, but had made, even under Chedd-Angier's theory, no binding agreement for the

---

**3.** Omni argues that under Mass.Gen.Laws Ann. ch. 93A, § 3(1)(b) (1975) (original § 3) it is exempt from liability because at least twenty per cent of its gross revenue is derived from transactions in interstate commerce and because the alleged misrepresentation did not occur in Massachusetts. Chedd-Angier claims that the interstate commerce exemption of the original § 3 no longer governs the liability determination in this proceeding because it was deleted effective July 20, 1983. We do not intend by our decision to reach the substantive aspects of the 93A count to pass judgment on the merits of Omni's claim of exemption. We merely decline to reach that issue here.

series. Accordingly, the promotional materials, although advertising the collaboration of Omni and Chedd-Angier as a fait accompli, necessarily reflected only the parties' tentative agreement. Claims by Chedd-Angier that it was misled by the pronouncements in the literature are, therefore, hard to comprehend.

■■■■■ This case "falls within the ordinary rule that false statements of opinion, of conditions to exist in the future, or of matters promissory in nature" are not actionable in a claim for misrepresentation. *Yerid v. Mason*, 341 Mass. 527, 530, 170 N.E.2d 718 (1960), cited in *Saxon Theatre Corp. of Boston v. Sage*, 347 Mass. 662, 667, 200 N.E.2d 241 (1964); *Continental Financial Services Co. v. The First National Boston Corp.*, No. 82–1505–T, slip op. (D.Mass. August 30, 1984). Chedd-Angier's reliance on *Cellucci v. Sun Oil Co.*, 2 Mass.App. 722, 320 N.E.2d 919 (1974), *aff'd.*, 368 Mass. 811, 331 N.E.2d 813 (1975) is misplaced. Although the basis of the misrepresentation in *Cellucci* was a future event, the signing of the contract, it was in the exclusive control of the defendant. Here settlement of the contract terms involved negotiation between the parties on a number of issues which were unresolved, even according to Chedd-Angier, through mid-March. Reliance on the promotional materials, at least prior to that point, was unreasonable. *Saxon Theatre Corp. of Boston v. Sage*, 347 Mass. at 667, 200 N.E.2d 241. After the April 4 meeting, in which the use of reporters was again brought into question, Chedd-Angier was put on notice that any reliance on the promotional materials was unjustified.

There is, in addition, little evidence in the record to support Chedd-Angier's contention that the statements in the promotional literature were knowingly false when made. Chedd-Angier points us to no direct evidence that Omni intended, for example, never to use a reporter format. Similarly, the record does not support the claim that Omni, by its words or actions, tried to induce Chedd-Angier to act in reliance on the representations in the promotional materials. Guccione, after all, never relinquished creative control over the series pro-

duction. Nor was he silent about his criticisms of the promotional tape.

Perhaps the most damaging evidence against Omni was its thirteen day delay in informing Chedd-Angier of its decision not to use the reporter format and to form its own production company. We believe, however, that this delay reflects lack of complete candor between the parties, rather than a violation of Chapter 93A. Therefore, even if Mass.Gen.Laws ch. 93A did apply to Omni, we affirm the district court's judgment on this issue.

Finally, Chedd-Angier argues that the district court's ruling on the 93A claim is irreconcilable with the court's earlier decision to submit the common law misrepresentation claim to the jury. Assuming without deciding that 93A requires no more proof of deception than common law misrepresentation, we find nothing inconsistent in ruling that the evidence is sufficient to go to the jury on misrepresentation, while at the same time it fails to persuade the court of 93A liability.

We find all remaining claims to be without merit. The judgment of the district court is

*Affirmed.*

