**Ryan TERBUSH, Plaintiff**

v.

**Commonwealth of MASSACHUSETTS, by its agency, The HAMPDEN COUNTY SHERIFF'S OFFICE, Thomas Lincoln, M.D., F. Brian Liebel, R.N., Lauren Chausse, and Louis Favata, PA–C, Defendants.**

**Civil Action No. 12–30044–KPN.**

United States District Court, D. Massachusetts.

Sept. 20, 2013.

Karen Catuogno, Law Office of Hector Pineiro, Worcester, MA, Ryan Terbush, Robert A. Scott, Worcester, MA, for Plaintiff.

Thomas E. Day, Egan, Flanagan & Cohen PC, Springfield, MA for Defendants.

*MEMORANDUM AND ORDER WITH REGARD TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (Document Nos. 32 and 33)*

KENNETH P. NEIMAN, United States Magistrate Judge.

Ryan Terbush ("Plaintiff") brought this action in state court asserting claims

against the Commonwealth of Massachusetts, Thomas Lincoln ("Dr. Lincoln"), a medical doctor, Brian Liebel ("Libel"), a registered nurse, and Louis Favata ("Favata"), a physician assistant (together "Defendants").[1] Plaintiff's claims arise out of his inability to provide a urine sample—allegedly caused by a condition known as "Shy Bladder Syndrome"—while participating in the Hampden County Sheriff's Department Day Reporting Program as well as subsequent medical issues following his return to the Hampden County Correctional Center ("HCCC"). In particular, Plaintiff asserts a civil rights claim for deliberate indifference to his serious medical needs against all defendants (Count I), a negligence claims against Dr. Lincoln (Count II), and a claim under Title II of the Americans with Disabilities Act ("ADA") and § 504 of the Rehabilitation Act against the Commonwealth (Count III).[2]

Defendants removed the action to this court pursuant to 28 U.S.C. § 1441. Presently, Defendants, with the exception of Dr. Lincoln who is not seeking summary judgment as to Count II, seek summary judgment on all of Plaintiff's remaining claims. Pursuant to 28 U.S.C. § 636(c) and Fed.R.Civ.P. 73, the parties have consented to the jurisdiction of this court. For the reasons that follow, the court grants Defendants' motion for summary judgment, leaving only Plaintiff's unchallenged medical malpractice claim against Dr. Lincoln.

## I. STANDARD OF REVIEW

When ruling on a motion for summary judgment, the court must construe the facts in a light most favorable to the non-moving party. *Benoit v. Tech. Mfg. Corp.*, 331 F.3d 166, 173 (1st Cir.2003). Summary judgment is appropriate when "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" when the evidence is such that a reasonable factfinder could resolve the point in favor of the non-moving party, and a fact is "material" when it might affect the outcome of the suit under the applicable law. *Morris v. Gov't Dev. Bank*, 27 F.3d 746, 748 (1st Cir.1994). The non-moving party bears the burden of placing at least one material fact into dispute after the moving party shows the absence of any disputed material fact. *Mendes v. Medtronic, Inc.*, 18 F.3d 13, 15 (1st Cir.1994) (discussing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

## II. BACKGROUND

### A. *Facts Not in Dispute*[3]

The parties do not dispute the following facts, which are construed in a light most

---

1. Plaintiff also brought claims against Lauren Chausse but has since dismissed her from the action.

2. Count II also asserted a negligence claim in against the Commonwealth, but Plaintiff now concedes, in light of findings of the Medical Malpractice Tribunal of the Hampden Superior Court, that such a claim is not viable.

3. Plaintiff, it should be noted, filed a motion to strike certain portions of Defendants' Statement of Undisputed Material Facts, which motion was denied by the court this day. It is also noted that Plaintiff only responded to five paragraphs of Defendants' Statement of Undisputed Material Facts and, as such, the remaining paragraphs have been deemed undisputed. *See* Fed.R.Civ.P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may ... consider the fact undisputed for purposes of the motion."); Local Rule 56.1 ("Material facts of record set forth in the statement required to be served by the moving party will be deemed for purposes of the motion to be admitted by opposing parties

favorable to Plaintiff, the non-moving party. The facts are extensive.

Plaintiff was incarcerated at HCCC, a correctional facility located in Ludlow, on ten separate occasions between April of 2002 and May of 2011. (Defendants' Statement of Undisputed Material Facts ("Defs' SOF") ¶¶ 3, 9–24.) Many of these incarcerations were related to substance abuse, a problem with which Plaintiff has struggled since his early teens. (*Id.* ¶¶ 10–24, 28–53.) The Hampden County Sheriff's Department operates HCCC on behalf of the Commonwealth of Massachusetts. (*Id.* ¶ 3.) During two of his incarcerations, Plaintiff was placed in the Day Reporting Program, which is also run by the Hampden County Sheriff's Department. (*Id.* ¶¶ 14, 21.) The Day Reporting Program provides home-based incarceration for selected inmates with the goal of transitioning them back to the community; inmates are still "incarcerated" but are allowed to live at home under strict reporting conditions. (*Id.* ¶¶ 7, 8.) One such condition is random drug tests; the failure to produce a urine sample within three hours of a request could result in a disciplinary violation and a return to HCCC pending an investigation. (*Id.* ¶¶ 71–72.) Day Reporting Program policy also requires that, during the urine test, an officer must observe the urine leave the body. (*Id.* ¶ 73.)

Plaintiff claims to suffer from Shy Bladder Syndrome ("SBS") which, in his case, prevents him from urinating in front of others when providing urine samples for drug testing. (*Id.* ¶¶ 57, 62.) Still, Plaintiff maintains, he can urinate in a public bathroom and has had success urinating in front of others for drug tests when he was allowed to sit down. (*Id.* ¶¶ 58–59, 62, 84.)

On November 4, 2008, during Plaintiff's eighth incarceration in the custody of the Hampden County Sheriff's Department, he was transferred from HCCC to the Day Reporting Program.[4] (*Id.* ¶ 65.) Upon entering the program, Plaintiff was aware that he would be subject to random drug tests and that a failure to provide a urine sample was a violation of the Day Reporting Program rules, which would result in his return to HCCC. (*Id.* ¶ 70.) Throughout the screening process and upon his entrance into the program, Plaintiff never mentioned to anyone that he suffered from SBS and he did not request any accommodation. (*Id.* ¶ 78.) Plaintiff's mother, however, claims to have provided a Doctor's note to a Day Reporting Program staff member shortly before Plaintiff began the program. (Exhibit 1 (attached to Plaintiff's Opposition to Defendants' Motion for Summary Judgment ("Pl's Opp")).) The note—which is signed by Alfred Piel, a physician at RiverBend Medical Group, and dated November 16, 2001—states that Plaintiff "apparently has 'shy bladder' and is unable to provide a supervised urine sample." (*Id.*) Dr. Piel continued: "For this reason I would recommend that an unsupervised urine be allowed (taking precautions to prevent switching of urine samples)." (*Id.*) In addition, Plaintiff claims that he informed a correctional staff member of his medical condition on November 10, 2008, and that the staff member allowed him to sit while urinating for the

unless controverted by the statement required to be served by opposing parties.").

4. During his second incarceration, in 2003, Plaintiff violated the Day Reporting Program by taking Vicodin. (*Id.* ¶¶ 14, 39.) As a result, he was returned to HCCC for a week but then allowed to resume the Day Reporting Program. (*Id.* ¶ 39.) Approximately one month after his return, Plaintiff admitted that he had relapsed on heroin and was returned to HCCC, where he served the remainder of his sentence. (*Id.* ¶ 40.)

drug test under observation that day. (Pl's Opp ¶ 78; Exhibit H (attached to Defs' SOF'); Defs' SOF ¶ 84.)[5]

On November 13, 2008, a correctional officer requested that Plaintiff produce a urine sample for a random drug test. (Defs' SOF ¶ 85.) At some point Plaintiff stated that he had SBS and could not urinate and asked to sit down while urinating. (*Id.* ¶ 86.) The officer initially did not permit him to sit down but allowed Plaintiff to drink water and run a faucet in order to aid him in urinating. (*Id.* ¶ 87.) Eventually, Plaintiff was allowed to sit on the toilet but still could not urinate. (*Id.*) After attempting to do so for more than the three hours allowed by Day Reporting Program rules, Plaintiff still could not produce a urine sample. (*Id.* ¶ 88.) As a result, he was returned to HCCC that night on an "administrative return," *i.e.*, he did not receive any disciplinary consequences or loss of privileges for his failure to produce a urine sample. (*Id.* ¶¶ 88–89.)

Upon being returned to HCCC that night, Plaintiff underwent an intake screening process, during which he stated to two different HCCC employees that he had consumed alcohol while participating in the Day Reporting Program and that he was detoxing. (*Id.* ¶¶ 90–91, 98–99.) Plaintiff's statements about consuming alcohol while participating made him ineligible to return to the Day Reporting Program. (*Id.* ¶ 101.) In any event, Plaintiff did not complain to anyone about urinary retention issues when he returned to HCCC on November 13, 2008. (*Id.* ¶ 102.) Plaintiff has since explained during the course of this litigation, however, that he lied about using alcohol so that he could obtain Librium, a drug used by HCCC as part of its alcohol detox protocol. (*Id.* ¶¶ 92, 100.)

The next day, November 14, 2008, Plaintiff was examined by Favata, a Certified Physician Assistant employed in HCCC's Health Services Department. (*Id.* ¶¶ 6, 107.) Plaintiff did not complain to Favata at the time about any urinary retention, despite failing to urinate since his return to HCCC. (*Id.* ¶ 109). Favata noted that Plaintiff's genitourinary system was "unremarkable" and that he appeared "well-nourished" and had "[n]o apparent distress." (*Id.* ¶ 107.) It was not until November 15th or 16th that Plaintiff complained about urinary retention, at which time he was treated by catheterization. (*Id.* ¶ 104.)

On November 17, 2008, Favata evaluated Plaintiff for inability to void urine since his catheterization the previous day; Plaintiff also complained about lower back spasms. (*Id.* ¶ 110.) Favata noted that Plaintiff saw him on November 14, 2008, but failed to mention any problems with his lower back or difficulty urinating at that time. (*Id.* ¶¶ 110–111.) Based on Plaintiff's complaints, Favata ordered an ultrasound to rule out kidney stones and catheterized Plaintiff. (*Id.* ¶ 112.) Favata then consulted with his supervising physician, who advised that Plaintiff be sent to the emergency room. (*Id.*) Later that day, Plaintiff was sent to the Emergency Department of Mercy Hospital, where he was advised to use a Foley catheter with a leg bag. (*Id.* ¶ 113.) Plaintiff, however, refused and thereafter was straight catheterized. (*Id.*) Plaintiff then returned to HCCC with instructions that he be catheterized every six hours and a note suggesting that Plaintiff see a urologist. (*Id.* ¶¶ 113, 129; Exhibit D (attached to Defs' SOF) ¶ 6.) That night, Plaintiff visited with Joan Schermerhorn, a Registered Nurse

---

**5.** Plaintiff also claims that he was allowed to sit to urinate in the presence of a correctional officer when he participated in the Day Reporting Program in 2003. (Defs' SOF ¶ 58.)

at HCCC, for catheterization and evaluation, but he refused to be catheterized. (Defs' SOF ¶ 136.) The next morning, on November 18, 2008, Plaintiff was called to Health Services for a straight catheterization procedure, but he again refused. (*Id.* ¶ 137.)

Later that day, Favata conducted another examination of Plaintiff and catheterized him, after which Plaintiff stated he felt much better. (*Id.* ¶ 114.) Favata discussed Plaintiff's case with Dr. Lincoln, who was the Medical Director at HCCC and employed by Baystate Medical Center, and with Dr. Sarah Graff, a physician at HCCC; both physicians suggested eliminating one of Plaintiff's medications which they thought might be the cause of the urinary retention. (*Id.*) Dr. Graff then decreased Plaintiff's medications, placed a psychiatric referral, and ordered that he be closely followed on a daily basis. (*Id.*) In light of Plaintiff's refusal to be catheterized on two prior occasions, Favata and the physicians suggested straight catheterization at 8:00 a.m. and 8:00 p.m. each day so that Plaintiff would know the scheduled times. (*Id.*) Also on November 18, 2008, Plaintiff visited with Schermerhorn, the nurse, who provided him with instructions and assistance in self-catheterizing. (*Id.* ¶ 146.) Schermerhorn noted that Plaintiff's "aseptic technique was excellent and he feels comfortable performing this in the pod"; she also gave Plaintiff supplies to self-catheterize in the pod that evening. (*Id.*)

On November 20, 2008, Favata conducted another examination of Plaintiff for his urinary retention issues. (*Id.* ¶ 117.) Favata noted that Plaintiff continued to self-catheterize and had reported no difficulty; he ordered that Plaintiff continue self-catheterizing until his next evaluation on November 24, 2008. (*Id.*) Plaintiff also met Elizabeth Miele, a Registered Nurse at HCCC, who gave him additional self-catheterization supplies and emphasized the importance of proper sanitary precautions. (*Id.* ¶ 150.) Miele noted that Plaintiff stated "he feels comfortable with self-cathing and his bladder feels empty after cathing himself. [Plaintiff] reinforced to use betadine to cleanse the meatus before self cathing since the chances of getting an infection here are high. [Plaintiff] reinforced to wash hand well before and after the procedure." (*Id.*)

On November 24, 2008, Favata examined Plaintiff regarding his desire to discontinue self-catheterizing because it was too painful. (*Id.* ¶ 119.) Favata noted that Plaintiff had some discomfort but was not in acute distress. (*Id.*) He also noted that Plaintiff "walked into the exam room and sat on the table without grimacing at all in pain. He wasn't diaphoretic, he wasn't sweating, [but] his bladder was distended [and] . . . he had some scrotal swelling." (*Id.*) Plaintiff agreed to the placement of a Foley catheter, after which Favata gave him 800 milligrams of Motrin and inserted the catheter. (*Id.*) Favata then entered an order for Motrin and Naprosyn and advised Plaintiff to return if the pain worsened or if he developed a fever. (*Id.*) Favata also scheduled a follow-up appointment for November 26, 2008, tested Plaintiff's urine, started him on medication, and ordered blood work to make sure his kidneys were not compromised due to the urine retention. (*Id.*)

That same day, Favata completed a form to refer Plaintiff for a urology evaluation regarding his urinary retention. (*Id.* ¶¶ 121, 129.) By that point, Lori Hillman, another Registered Nurse at HCCC, had already referred Plaintiff to an outside urologist; Favata's form merely recorded the referral. (*Id.* ¶¶ 121, 130.) Plaintiff was scheduled to see the urologist on December 3, 2008. (*Id.* ¶ 131.) On Novem-

ber 26, 2008, Pioneer Valley Urology sent a letter directly to Plaintiff rescheduling his appointment to December 9, 2008, due to a scheduling conflict. (*Id.* ¶ 132.) Inmates at HCCC, however, are precluded from knowing the exact date and time of any outside appointments in order to reduce safety risks to the inmate, correctional officers, and members of the public. (*Id.* ¶ 133.) Thus, as a result of the letter, Plaintiff's appointment was again rescheduled, this time to December 17, 2008. (*Id.* ¶ 134.)

Favata evaluated Plaintiff again on November 26, 2008. (*Id.* ¶ 122.) The Foley catheter was in place and draining well, and there was no tenderness to Plaintiff's scrotum or testicles. (*Id.*) Favata prescribed Plaintiff pain medication in light of his complaint of pain and also scheduled another appointment for December 1, 2008. (*Id.*)

On November 28, 2008, Plaintiff saw Cynthia Jackson, a Registered Nurse at HCCC, after complaining to a pod officer that urine was leaking from the side of the Foley catheter. (*Id.* ¶ 155.) Jackson learned that Plaintiff slept on his stomach and advised that this might be irritating the catheter. (*Id.*) Jackson irrigated the catheter and noted that there was no discharge or penile swelling and that Plaintiff tolerated the irrigation with no complaint of pain or burning. (*Id.*) Later that day, Barbara Beckwith, yet another Registered Nurse at HCCC, examined Plaintiff for his complaint that he "ha[d] stuff coming out of [his] penis." (*Id.* ¶ 156.) Beckwith noted that Plaintiff had "purulent penile discharge" and conducted a urinalysis; she then ordered Bactrim for Plaintiff and advised him to drink lots of fluids, rest, avoid pulling or tugging on the catheter, and avoid sleeping on his stomach. (*Id.*) Two days later, on November 30, 2008, Plaintiff saw another Registered Nurse at HCCC,

Judith Bessette, because he was leaking urine around his catheter. (*Id.* ¶ 157.) Bessette noted a small urine stain on Plaintiff's underwear and that the catheter tubing was kinked and twisted around the back of his leg. (*Id.*) She adjusted the bag, explained to him the proper placement of the bag, and instructed him to drink more water because his urine was very concentrated. (*Id.*)

On December 1, 2008, Favata examined Plaintiff for his complaint of pain. (*Id.* ¶ 123.) A urine culture showed some bacteria. (*Id.*) After consulting with Dr. Lincoln and another physician, Favata removed the Foley catheter with the plan to return to straight catheterization. (*Id.*) Favata ordered Plaintiff antibiotics and additional pain medication and instructed him to catheterize at 7:00 a.m. and 9:00 p.m. daily. (*Id.*) Later that day, Plaintiff saw Favata again and stated that he was able to urinate on his own. (*Id.*) Plaintiff also stated that he had light blood stains on his underwear, and Favata explained that this was not uncommon in light of his problem. (*Id.*) Favata then advised Plaintiff to continue to drink eight to ten glasses of water each day to help flush his kidneys and bladder; he also scheduled a follow-up appointment for December 3, 2008. (*Id.*)

Plaintiff met with Favata that day and reported that he was doing well and urinating without difficulty or pain. (*Id.* ¶ 125.) Plaintiff explained, however, that he was still experiencing some blood in his underwear. (*Id.*) Favata conducted a physical examination of Plaintiff and advised him to increase his water intake and to return if the discharge continued. (*Id.*) Favata also tested Plaintiff's urine, which showed some blood and protein. (*Id.*) Plaintiff's urine was tested again on December 4, 2008, by Schermerhorn. (*Id.* ¶ 160.) On December 5, 2008, Favata dis-

cussed the results of Plaintiff's urine test with Dr. Lincoln, who advised that treatment with additional antibiotics was unnecessary at that time; Plaintiff had been urinating on his own without pain or difficulty for two days, and his urinary retention condition was deemed resolved. (*Id.* ¶¶ 127, 128.) On December 17, 2008, Plaintiff attended his outside urology appointment at Pioneer Valley Urology. (*Id.* ¶ 135.) Upon his return to HCCC, Schermerhorn ordered several medications prescribed by the urologist and reviewed the medication policy with Plaintiff. (*Id.*) Plaintiff did not suffer any permanent injury from the urinary retention issues he experienced in November and December of 2008. (*Id.* ¶ 172.)

On November 24, 2008, it should be noted Plaintiff filed an Inmate Grievance Form complaining about the quality of his medical care. (*Id.* ¶ 165.) In response to this grievance, Liebel, a Registered Nurse who served as the Health Services Administrator at HCCC, spoke with Favata and reviewed Plaintiff's medical file. (*Id.*) Liebel responded to Plaintiff by explaining that he had received excellent care while in the custody of HCCC and assured him that he was scheduled to follow-up with an outside urologist. (*Id.*) Plaintiff did not appeal Liebel's responses to his grievances.[6] (*Id.* ¶ 167.) Other than this correspondence, Liebel had no involvement with Plaintiff's care. (*Id.* ¶¶ 161–165, 168–169.)

### B. *Procedural History*

The instant case was filed on November 10, 2011, in the Hampden County Superior Court and was removed to this court on March 6, 2012. On May 15, 2012, this court granted the parties' motion to refer the medical malpractice claims to the Superior Court's Medical Malpractice Tribunal. On December 3, 2012, the Superior Court reported that the tribunal made the following findings. As to Dr. Lincoln, "there is sufficient evidence to raise a legitimate question as to liability appropriate for judicial inquiry." (Doc. No. 23.) As to Brian Liebel, Lauren Chausse, and Louis Favata, however, "there is not sufficient evidence to raise a legitimate question as to liability appropriate for judicial inquiry." (*Id.*)

### III. DISCUSSION

### A. *Eighth Amendment Claim*

The Commonwealth of Massachusetts, Liebel, and Favata ("the HCCC Defendants") argue that Plaintiff cannot satisfy the required standard for an Eighth Amendment deliberate indifference claim. In particular, the HCCC Defendants argue that Liebel did not provide any clinical care to Plaintiff and played no role in his medical care. They also argue that Favata provided extensive and adequate medical care. For his part, Dr. Lincoln, in addition to relying on the HCCC Defendants' arguments regarding the adequacy of Plaintiff's medical care, argues that he is not subject to a section 1983 claim because he was not an employee of the Commonwealth but, rather, was employed by Baystate Medical Center.

In response, Plaintiff argues that Defendants were deliberately indifferent to his serious medical needs. In particular, he points to the affidavit of Richard F. Sullivan, an emergency physician, which opines that Plaintiff "suffered because of a failure to treat an obvious and serious medical need." (Exhibit 2 (attached to Pl's Opp).) Plaintiff also argues that Dr. Lincoln is subject to section 1983 liability because his

---

6. Plaintiff also filed a second grievance which requested a response to his first grievance. (*Id.* ¶ 166.) Liebel responded to this second grievance by referring to his response to Plaintiff's first grievance. (*Id.*)

conduct was sufficiently tied to the state such that he should be deemed a "state actor."

■ "The failure of correctional officials to provide inmates with adequate medical care may offend the Eighth Amendment if their 'acts or omissions [are] sufficiently harmful to evidence deliberate indifference to serious medical needs.'" *Leavitt v. Correctional Medical Servs., Inc.*, 645 F.3d 484, 497 (1st Cir. 2011) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). To succeed on a such a claim, "a plaintiff must satisfy both a subjective and objective inquiry: he must show first, 'that prison officials possessed a sufficiently culpable state of mind, namely one of deliberate indifference to an inmate's health or safety,' and second, that the deprivation alleged was 'objectively, sufficiently serious.'" *Id.* (quoting *Burrell v. Hampshire Cnty.*, 307 F.3d 1, 3 (1st Cir.2002)). The deliberate indifference standard "encompasses a narrow band of conduct: subpar care amounting to negligence or even malpractice does not give rise to a constitutional claim ... rather, the treatment provided must have been so inadequate as to constitute an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind." *Id.* (internal citations and quotation marks omitted); see also *DesRosiers v. Moran*, 949 F.2d 15, 19 (1st Cir.1991) ("While this mental state can aptly be described as 'recklessness,' it is recklessness not in the tort-law sense but in the appreciably stricter criminal-law sense, requiring actual knowledge of impending harm, easily preventable.").

■ Moreover, "'[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and constitutionalize claims which sound in state tort law.'" *Layne v. Vinzant*, 657 F.2d 468, 474 (1st Cir.1981) (quoting *Westlake v. Lucas*, 537 F.2d 857, 860 n. 5 (6th Cir.1976)); see also *Sires v. Berman*, 834 F.2d 9, 13 (1st Cir.1987) ("Where the dispute concerns not the absence of help, but the choice of a certain course of treatment, or evidences mere disagreement with considered medical judgment, we will not second guess the doctors."). Rather, "[t]he care provided must have been 'so inadequate as to shock the conscience.'" *Feeney v. Correctional Servs., Inc.*, 464 F.3d 158, 162 (1st Cir.2006) (quoting *Torraco v. Maloney*, 923 F.2d 231, 235 (1st Cir.1991)).

■ Here, in light of the undisputed record, even when viewed in a light most favorable to Plaintiff, this is not a case in which an inmate was denied medical care, let alone one that rises to the level of an Eighth Amendment violation. The test for present purposes is whether the medical care that was provided "was so clearly inadequate as to amount to a refusal to provide essential care," *Miranda v. Munoz*, 770 F.2d 255, 259 (1st Cir.1985), or was "so inadequate as to shock the conscience," *Torraco*, 923 F.2d at 235. Plaintiff has not and cannot meet this standard.

As described, Plaintiff, upon returning to HCCC, received extensive medical care on practically a daily basis, sometimes multiple times a day. It is also undisputed that Plaintiff failed to inform anyone at HCCC of his urinary retention until two or three days after returning to HCCC, even though he met with multiple HCCC employees during the intake screening process and was examined by Favata the next day. Plaintiff also was sent to Mercy Hospital on November 17, 2008, one or two days after he first complained about his urinary retention. While Plaintiff did not see an outside urologist until December 17, 2008, at which point his medical issues were resolved, his original appointment

was for December 3, 2008; that appointment was rescheduled twice through no fault of HCCC—once by Pioneer Valley Urology and a second time for security reasons (because Plaintiff received advance notice of the date and time of the first rescheduled appointment in violation of HCCC policy).

In addition, it is undisputed that Plaintiff often refused to cooperate with medical advice. For instance, he initially refused placement of a Foley catheter, which necessitated straight catheterization multiple times each day. He also refused straight catheterizations by HCCC medical staff and eventually opted to catheterize himself. When the straight catheterization caused him pain, Favata inserted an indwelling Foley catheter with Plaintiff's consent; and when a urine test showed bacteria in Plaintiff's urine, Favata removed the Foley catheter. Plaintiff also received instructions for avoiding issues related to the catheters as well medications to treat infection and alleviate pain.

Dr. Sullivan's affidavit—which states that he is "familiar with the concept of deliberate indifference" and indicates that that standard has been met here—does not alter the court's conclusion. First, Dr. Sullivan's statement regarding the deliberate indifference standard concerns a legal not a medical concept, for which he is unqualified to provide an opinion. *See Nieves–Villanueva v. Soto–Rivera*, 133 F.3d 92, 99 (1st Cir.1997); *Hayes v. Douglas Dynamics, Inc.*, 8 F.3d 88, 92 (1st Cir.1993). Second, as the HCCC Defendants argue, Plaintiff provided this same affidavit to the Medical Malpractice Tribunal, which found "that there is not sufficient evidence to raise a legitimate question as to liability appropriate for judicial inquiry" as to Plaintiff's claims of medical negligence against Favata and Liebel. If this affidavit (and other evidence) cannot "raise a legitimate question" as to medical malpractice as to Favata and Liebel, then surely it does not support a finding of deliberate indifference. *See* M.G.L. c. 231, § 60 (medical malpractice tribunal "shall determine if the evidence presented [by the plaintiff] if substantiated is sufficient to raise a legitimate question of liability appropriate for judicial inquiry or whether the plaintiff's case is merely an unfortunate medical result").

The same holds true as to Dr. Lincoln. To be sure, the Tribunal found that there was sufficient evidence to raise a legitimate question as to the medical malpractice claim against him. As mentioned, however, "subpar care amounting to negligence or even malpractice does not give rise to a constitutional claim." *Leavitt*, 645 F.3d at 497. Thus, while Plaintiff might have benefitted from different treatment despite the extensive medical care he did receive, the court concludes given the undisputed facts that a reasonable jury could not find an Eighth Amendment violation as to Dr. Lincoln. *See, e.g., Navedo v. Maloney*, 172 F.Supp.2d 276, 285 (D.Mass. 2001) ("While it may be that defendants Hall and Battle *could* have done more in terms of procuring treatment for Navedo, this is far short of the standard of 'deliberate indifference' to which the Eighth Amendment holds prison officials."). Although Dr. Lincoln was the medical director at HCCC, there were only three instances in which he was directly involved in Plaintiff's care. *See id.* at 284 ("[B]ecause respondeat superior is not available as a theory of liability under § 1983 . . . a supervisory official's liability must stem from his or her own actions or omissions, which must be affirmatively connect[ed] to the subordinate's violative act or omission, and which must themselves rise to the level of deliberate indifference." (citations and internal quotation marks omitted)). Plaintiff has not brought to the court's

attention anything in those instances, or in Plaintiff's medical care as a whole for that matter, which rises to level of deliberate indifference.

Indeed, in opposing Dr. Lincoln's motion for summary judgment, Plaintiff does not even address the merits of the Eighth Amendment claim against him. Rather, Plaintiff limits his argument to whether Dr. Lincoln was a "state actor," explaining that "the only issue raised by [Dr. Lincoln's] motion is the question of whether [he] was a state actor for purposes of § 1983." In his motion for summary judgment, however, Dr. Lincoln incorporated the HCCC Defendants' argument that Plaintiff did not receive deliberately indifferent medical care while at HCCC, which argument, for the reasons set forth above, is persuasive. Thus, even were the court to deem Dr. Lincoln a "state actor," and thus amenable to suit under section 1983, see *West v. Atkins*, 487 U.S. 42, 44, 55–57, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988) (private physician contracted to provide medical services to correctional facility was a "state actor" under section 1983), the Eighth Amendment claim against him must fail.

Accordingly, the court will enter summary judgment in favor of Defendants on Count I of Plaintiff's complaint.

### B. *ADA and Rehabilitation Act Claim*

The Commonwealth makes four separate arguments in support of its request for summary judgment on Count III, the ADA and Rehabilitation Act claim: (1) SBS is not a disability under the ADA; (2) Plaintiff never provided adequate notice of the condition so as to trigger accommodations; (3) the Day Reporting Program, in any event, provided reasonable accommodations; and (4) Plaintiff was not otherwise qualified for the benefit of the Day Reporting Program and was not excluded

from the program because of his disability. The court finds the Commonwealth's first and fourth arguments persuasive and, thus, has no need to address the other two. Indeed, even were the court to reject the Commonwealth's second and third arguments, it would not alter the end result, namely, judgment in favor of the Commonwealth on Count III.

█ Title II of the ADA "prohibits discrimination against persons with disabilities by 'public entities,' and is modeled on § 504 of the Rehabilitation Act, Pub.L. No. 93–112, 87 Stat. 355 (1973) (codified as amended in scattered sections of 29 U.S.C.). In applying Title II, therefore, [courts may] rely interchangeably on decisional law applying § 504." *Parker v. Universidad de Puerto Rico*, 225 F.3d 1, 5 (1st Cir.2000). Accordingly, it is appropriate here to "address the merits of Plaintiff's ADA and [Rehabilitation Acts] claims simultaneously." *Partelow v. Massachusetts*, 442 F.Supp.2d 41, 47 (D.Mass.2006). "Pursuant to these statutes, a plaintiff must show: '(1) that he is a qualified individual with a disability; (2) that he was ... excluded from participation in ... a public entity's services, programs, or activities or was otherwise discriminated against; and (3) that such exclusion ... or discrimination was by reason of [his] disability." *Id.* at 47–48 (quoting *Parker*, 225 F.3d at 5).

#### 1. *Whether Shy Bladder Syndrome is a "Disability"*

In arguing that Plaintiff's SBS is not a "disability" under the ADA, the Commonwealth points out that his condition only "limits" him in one particular narrow circumstance, *i.e.*, urinating while standing up and under observation for a drug test. The Commonwealth contends, therefore, that Plaintiff's condition does not substantially limit a major life activity and that

mitigating measures, such as sitting down, can correct the "impairment." The Commonwealth also cites a number of cases in which courts have held that SBS is not a disability. In response, Plaintiff argues that "[i]t is absurd to claim that shy bladder is a mere impairment that does not limit a major life activity" and that this is ultimately a jury question.

 For present purposes, an individual is "disabled" under the ADA if he has "a physical or mental impairment that substantially limits one or more [of his] major life activities." 42 U.S.C. § 12102(1)(A).[7] As the Supreme Court explained in *Toyota*, the terms "substantially" and "major" "need to be interpreted strictly to create a demanding standard for qualifying as disabled." *Toyota*, 534 U.S. at 197, 122 S.Ct. 681; *see id.* at 196, 122 S.Ct. 681 (" '[S]ubstantially' in the phrase 'substantially limits' suggests 'considerable' or 'to a large degree.' "); *id.* at 197, 122 S.Ct. 681 (" 'Major' in the phrase 'major life activities' means important.... 'Major life activities' thus refers to those activities that are of central importance to daily life."). The court continued:

> In determining whether an individual is substantially limited in a major life activity ... the following factors should be considered: the nature and severity of the impairment; the duration or expected duration of the impairment; and the permanent or long-term impact, or the expected permanent or long-term impact of or resulting from the impairment.

*Id.* at 196, 122 S.Ct. 681 (internal quotation marks omitted). In this regard, as the Supreme Court explained in an earlier decision, "if a person is taking measures to correct for, or mitigate, a physical or mental impairment, the effects of those measures—both positive and negative—must be taken into account when judging whether that person is 'substantially limited' in a major life activity and thus 'disabled' under the Act." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 482, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999).

 Here, the court believes that Plaintiff's specific condition did not adequately rise to the level of a disability under the pre-ADA Amendments Act of 2008 standard. It is undisputed that Plaintiff's impairment only prevented him from urinating while standing in front of others for purposes of a drug test. It did not prevent him from urinating in general or even urinating in a public bathroom. Moreover, Plaintiff was able to urinate in front of others for drug tests when allowed to sit. As such, as the Commonwealth argues, mitigating measures can correct the asserted impairment. Thus, while urination itself is a major life activity, it defies credulity that urinating in front of others for drug tests is an activity that is "of central importance to daily life." *Toyota*, 534 U.S. at 197, 122 S.Ct. 681.

Granted, Plaintiff was unsuccessful in urinating for his drug test on November 13, 2008, even after he was allowed to sit down. With this in mind, Plaintiff alleges that the correctional officer waited too

---

**7.** The court will analyze this question in accord with the stricter definition of disability in effect prior to the ADA Amendments Act of 2008. As explained in *Thornton v. United Parcel Service, Inc.*, 587 F.3d 27, 34 n. 5 (1st Cir.2009), "the ADA Amendments Act of 2008, Pub.L. No. 110–325, 122 Stat. 3553, 3553–55 (2008), became effective on January 1, 2009. That Act expanded the definition of 'disability' from the strict requirements laid out in *Toyota* [*Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002)]." The new definition, however, is not retroactive and therefore does not apply to conduct which occurred prior to January 1, 2009. *Id.* The relevant time period here is November of 2008.

long before allowing him to sit, which prevented him from urinating even after being allowed to sit. (See Complaint ¶ 41 ("So great was the plaintiff's discomfort from urinary retention and his stress over his failure to void and the prospect of being returned to jail, that due to his SBS he could not at that time void even when allowed to sit.").) Still, in the court's view, this does not convert Plaintiff's particular SBS into a major life activity.

There is more than adequate support in the case law for this conclusion. *See Balistrieri v. Express Drug Screening, LLC*, 2008 WL 906236, at *5 (E.D.Wisc. March 31, 2008) ("[T]he court cannot conclude that Balistrieri's shy bladder syndrome qualifies him as disabled under § 12102(2)(A) of the ADA."); *Oyague v. State*, 2000 WL 1231406, at *3 (S.D.N.Y. Aug. 31, 2000) ("Plaintiff's alleged difficulty in producing a urine sample is not a disability within the meaning of the [ADA]."). The analysis in *Linkous v. CraftMaster Mfg., Inc.*, 2012 WL 2905598, at *5 (W.D.Va. July 16, 2012), is similarly relevant. There, the court held that while urination itself is a "major life activity," the plaintiff's SBS did not cause a substantial limitation on his ability to urinate. *Linkous*, 2012 WL 2905598, at *4–5. As the court explained,

> plaintiff gives only one specific example of being completely unable to urinate because of his disorder, which was during his observed drug test. While plaintiff claims that he experienced difficulty in public urinals or when asked to urinate under direct observation, he was able to manage these difficulties by simply using a bathroom stall and closing the door, or using the restroom when others were not present.

*Id.* at *5. Because the plaintiff gave only "one example of a restriction severe enough to actually prevent him from being

able to urinate at all," the court held that the impairment could not qualify as a substantial limitation. *Id.; see also Gibbon v. City of New York*, 2008 WL 5068966, at *3 (S.D.N.Y. Nov. 25, 2008) (plaintiff's benign prostate hyperplasia condition, which prevented him from urinating during a drug test, did not substantially limit a major life activity because Flomax medication alleviated his symptoms and allowed him to urinate normally). Here, too, Plaintiff has not brought forward sufficient evidence to counter the Commonwealth's unrebutted argument that his condition does not substantially limit a major life activity and, as such, that he does not have a "disability" under the ADA.

### 2. *Plaintiff's Eligibility for the Day Reporting Program*

Even were the court to find Plaintiff's limited SBS a disability, the Commonwealth's fourth argument, *i.e.*, that Plaintiff was not otherwise qualified for the benefit of the Day Reporting Program, is determinative of his ADA and Rehabilitation Act claim in light of his statement that had used alcohol while participating in the program.

Under Title II of the ADA, a "qualified individual with a disability" is defined, in relevant part, as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices ... meets the essential eligibility requirements for the receipt or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2); *see also Clarkson v. Coughlin*, 898 F.Supp. 1019, 1037 (S.D.N.Y.1995) ("As under the Rehabilitation Act, the protections afforded by the ADA turn on whether, with or without reasonable accommodations in programs and services, a disabled individual meets the essential eligibility requirements to participate in the program or receive the benefit in question.").

Here, it is undisputed that as soon as Plaintiff returned to HCCC on November 13, 2008, he told multiple employees that he had consumed alcohol while participating in the Day Reporting Program and that he was detoxing. To be sure, Plaintiff has since explained that he did not actually consume alcohol but, rather, that he lied so that he could obtain a drug that HCCC provides to inmates who are detoxing. Still, putting the propriety of this lie aside, it is undisputed that, as soon as he stated that he had consumed alcohol, Plaintiff was ineligible for continued participation in the Day Reporting Program.

It is also undisputed that Plaintiff was returned to HCCC on an "administrative return," rather than a "disciplinary return," because the Day Reporting Program had no other means of drug testing Plaintiff. An "administrative return" does not entail any loss of privileges or disciplinary consequences. There is also evidence that, if Plaintiff had not admitted to alcohol use, the Sheriff's Department would have attempted to provide a further accommodation to Plaintiff in the Day Reporting Program pending confirmation of his medical condition. (*See* Exhibit F (attached to Defs' SOF) at ¶ 20.) In short, Plaintiff's inability to provide a urine sample did not itself bar him from the program.

 In sum, it was Plaintiff's statements about alcohol use, not his failure to produce urine, that caused his exclusion from the Day Reporting Program. It is for that reason that he did not meet "the essential eligibility requirements for" participation in the Day Reporting Program and, therefore, was not a "qualified individual with a disability." As the Commonwealth argues, Plaintiff's claim must fail at the third prong because he was not excluded from the Day Reporting Program "by reason of his disability." *See Fradera v. Municipality of Mayaguez*, 440 F.3d 17, 22 (1st Cir.2006) (plaintiff must demonstrate "(1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities or was otherwise discriminated against; and (3) that such exclusion, denial of benefits, or discrimination *was by reason of the plaintiff's disability.*").[8]

Accordingly, the court will enter summary judgment in favor of the Commonwealth on Count III of Plaintiff's complaint.[9]

## C. *Remaining Medical Malpractice Claim Against Dr. Lincoln*

As mentioned, Dr. Lincoln has not sought summary judgment on the medical malpractice claim against him, Count II. Because this state law claim is the only one which survives Defendants' motions for summary judgment, the court must decide whether to retain supplemental jurisdiction over it. *See* 28 U.S.C. § 1367(c)(3). It will.

As the First Circuit explained, "[i]n a federal-question case, the termination of

---

8. It is also undisputed that Plaintiff rendered himself further ineligible for participation in the Day Reporting Program by committing ten separate institutional rules violations between December 9, 2008 and June 13, 2008. (Defs' SOF ¶ 175.) Three of the instances involved physical altercations with other inmates, two involved improper use of medication, and two involved gambling. (*Id.*)

9. In light of the court's rulings on Counts I and III, it is unnecessary to address the Commonwealth's additional argument that Plaintiff failed to exhaust his administrative remedies.

the foundational federal claim does not divest the district court of power to exercise supplemental jurisdiction but, rather, sets the stage for an exercise of the court's informed discretion." *Roche v. John Hancock Mut. Life Ins. Co.*, 81 F.3d 249, 256–57 (1st Cir.1996). "In deciding whether or not to retain jurisdiction on such an occasion, the trial court must take into account concerns of comity, judicial economy, convenience, fairness, and the like." *Id.* at 257.

Here, as in *Roche*, "discovery ha[s] closed, the summary judgment record [is] complete ... and powerful interests in both judicial economy and fairness tug[ ] in favor of retaining jurisdiction." *Id.* Moreover, as far as the court is aware, the remaining claim does not present a particularly novel question of state law. Accordingly, the court will exercise its discretion to retain supplemental jurisdiction over the medical malpractice claim against Dr. Lincoln.

## IV. Conclusion

For the reasons stated, Defendants' motions for summary judgment are ALLOWED. The Clerk shall schedule a pretrial conference and trial on Plaintiff's medical malpractice claim against Dr. Lincoln.

IT IS SO ORDERED.